RYDER INTERNATIONAL COR-
PORATION, a corporation,
Plaintiff–Appellant,

v.

FIRST AMERICAN NATIONAL
BANK, Defendant–Appellee.

No. 90–7777.

United States Court of Appeals,
Eleventh Circuit.

Oct. 9, 1991.

Samuel H. Franklin, John M. Johnson, William H. King, Lightfoot, Franklin, White & Lucas, Birmingham, Ala., for plaintiff-appellant.

David B. Anderson, Elizabeth Allen Champlin, Walston, Stabler, Wells, Anderson & Bains, Birmingham, Ala., for defendant-appellee.

Before COX and BIRCH, Circuit Judges, and ENGEL *, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

On August 16, 1989, Ryder International Corporation filed suit in district court against First American National Bank, asserting violations of both federal and state securities laws, among other claims. The claims arose from the purchase by Ryder of approximately $400,000 of commercial paper issued by Integrated Resources, Inc., a publicly held company which defaulted on its commercial paper obligations in June of 1989. The Integrated commercial paper was one of a dozen or so securities offered by First American to those customers seeking higher returns than the yield produced by interest bearing instruments.

Ryder voluntarily dismissed all of its claims except one, which is based on section 12(2) of the Securities Act of 1933 and section 8–6–19(a) of the Alabama blue sky laws.[1] After extensive discovery, the district court granted summary judgment for First American. 749 F.Supp. 1569. The court concluded that the bank's conduct of providing financial information concerning the available commercial paper for sale by others and its mechanical act of executing Ryder's orders did not make the bank an "offeror" or a "seller" under section 12(2). For the reasons that follow, we affirm.

### I.

Ryder is a manufacturing business which regularly makes short-term investments to earn interest on its excess cash. At the beginning of Ryder's banking relationship with First American in 1987, Frank Ryder, the President of Ryder, briefly and orally gave First American "investment criteria" suggesting GMAC as an example of the desired type of commercial paper Ryder would later purchase through Wallace Case, a Vice President of Ryder, whom Frank Ryder trusted "to look after my interests." Frank Ryder also told the First American executives he met with that he "wasn't looking for any more risk than GMAC" of which he had little knowledge. Frank Ryder had no more documented involvement with Ryder's investments. The company has no written guidelines regarding Ryder's investments. Besides granting plenary authority to Wallace Case to make the investments, Frank Ryder retained Leo Krupp, a business consultant, to advise but not control Case with regard to the making and monitoring of investments. Over time, from 1984 to 1989, Case used millions of dollars of Ryder's excess money to make short term investments through several different institutions.

On two occasions, March 20, 1989 and April 19, 1989, Ryder (through Wallace Case) used First American to buy commercial paper issued by Integrated which would pay $400,000 at maturity in June, 1989. First American, in turn, bought the paper for Ryder from Drexel Lambert, the underwriter and exclusive dealer for Inte-

---

* Honorable Albert J. Engel, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Both parties acknowledged in the district court that the basic elements of the federal and state causes of action are the same and that Alabama courts have looked to federal case law construing section 12(2) in interpreting section 8–6–19. Thus, we do not engage in any discussion on the scope of Alabama's counterpart to section 12(2), and we assume that our disposition of the case under section 12(2) applies equally to the state claim. Section 12 provides in relevant part:

Any person who—
　(1) offers or sells a security in violation of section 77e of this title, or

　(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable to the person purchasing such security from him....
15 U.S.C.A. § 77*l*.

grated. The issuer, Integrated, was at that time a New York Stock Exchange listed company, required by the Security Exchange Act to file and publicly disseminate annual, quarterly, and other periodic reports and information about its business.

On the first occasion on which the Integrated paper was purchased, Wallace Case at Ryder asked Mike Casey at First American for "rates on 90–day paper for $200,000.00." Mike Casey gave Case the rates on several investments, including Integrated paper, other commercial paper, government obligations and C.D.'s. Case then checked the Wall Street Journal for trades in Integrated's common stock and certain Standard and Poor information, and he concluded that Integrated commercial paper "was a good investment at the yield quoted." He then called Mike Casey and instructed him to buy the commercial paper on Ryder's behalf. The second purchase of Integrated paper occurred in substantially the same way.

Ryder later learned that First American had a lending relationship with Integrated since 1984. In the mid–1980s, Integrated was heavily involved in the business of selling real estate tax shelters (of which Ryder had knowledge). Integrated subsequently developed cash flow difficulties which forced Integrated to diversify its financial services. The record does not reveal how much knowledge First American's loan department had with regard to Integrated's financial difficulties. First American's loan department did know that ICH was interested in an equity investment in Integrated back in late 1988, a transaction which never materialized. Further, the bank knew that at that time Integrated was placed on a "credit watch," the meaning of which is disputed by the parties. Ryder claims First American also knew that Integrated had been experiencing cash flow problems, causing the bank to reevaluate its commercial lending line of credit to Integrated. Whatever information the loan department had, however, was communicated neither to Mike Casey in the Capital Markets Department of First

American nor to Wallace Case who subsequently bought Integrated's commercial paper on behalf of Ryder. In June, 1989, Integrated defaulted on Ryder's investment. Ryder then sued First American.

## II.

■■■ A court may resolve security issues on summary judgment. *Dennis v. General Imaging, Inc.,* 918 F.2d 496 (5th Cir.1990); *Pharo v. Smith,* 621 F.2d 656, 675 (5th Cir.1980). Our review of a grant of summary judgment is plenary. *Mercantile Bank & Trust v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985). All reasonable inferences from the evidence contained in the record are to be drawn in favor of the non-movant, Ryder. *Carlin Communication, Inc. v. Southern Bell,* 802 F.2d 1352, 1356 (11th Cir.1986) (citation omitted). The court may not weigh conflicting evidence to resolve factual disputes; if a genuine issue is found, summary judgment must be denied. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). Summary judgment should be granted however, when, after adequate time for discovery and upon motion, a party fails to make a sufficient showing to establish the existence of an element essential to that party's case on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

On appeal, Ryder claims First American misstated or omitted material facts in connection with its purchase of $400,000 worth of Integrated paper, conduct Ryder argues violated section 12(2) of the Securities Act as well as Alabama's statutory counterpart.[2] The federal statute provides in relevant part that "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact ... shall be liable to the person purchasing such security from him." 15 U.S.C.A. § 77*l*(2) (West 1981). "In delimiting the scope of § 12, authority controlling

---

**2.** First American has never contested the fact that the commercial paper at issue is a "securi-

ty" under the 1933 Act.

in this circuit[3] has sought to determine whether a defendant's role 'constituted him a seller for purposes of that section.'" *Foster v. Jesup and Lamont Sec. Co., Inc.,* 759 F.2d 838, 843 (11th Cir.1985) (quoting *Junker v. Crory,* 650 F.2d 1349, 1360 (5th Cir.1981)). Accordingly, the threshold issue presented before this court is whether a bank should be deemed a seller[4] under section 12(2) when it acts as an intermediary in the purchase of securities through a registered dealer.[5]

### A. Whether First American is a "Seller" Under § 12(2)

As the Securities Act of 1933 "nowhere delineates who may be regarded as a statutory seller [under section 12], and the sparse legislative history sheds no light on the issue," the courts of appeal "have not defined the term uniformly." *Pinter v. Dahl,* 486 U.S. 622, 642, 108 S.Ct. 2063, 2076, 100 L.Ed.2d 658 (1988). While the Supreme Court has yet to consider the scope of section 12(2),[6] it has recently reviewed and defined the scope of section 12(1) in *Pinter v. Dahl, supra.* That case modified previous Eleventh Circuit case law on section 12(1) status, and is discussed in detail below at the end of subsection one.

### 1. The Scope of Section 12(2) Prior to Pinter

A brief summary of the evolution of section 12(2) as an anti-fraud measure in the arena of securities regulation is useful in analyzing the effect of *Pinter* on this circuit's interpretation of the scope of that statute. In the early years following the passage of the 1933 Act, courts were reluctant to impose 12(2) liability beyond the immediate seller of securities. In furtherance of the remedial purposes of the Act,[7] however, a number of courts slowly expanded the definition of "seller" so as to abolish any threshold requirement of contractual privity.

Accordingly, prior to *Pinter* a split existed among circuits as to whether a section 12(2) plaintiff must establish privity between the plaintiff-purchaser and the defendant-seller in order for the defendant to be considered a "seller." The Third and Seventh Circuits had held that section 12(2) required privity.[8] The Second, Fourth, Fifth, Sixth, Eighth, Ninth and Eleventh Circuits had held otherwise, using either a "substantial factor" test, a "proximate cause" test or a variation thereof[9] to de-

---

3. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

4. Although the term "seller" is not defined in the 1933 Act, the terms "sale," "sell" and "offer" are defined. *See* Section 2(3), 15 U.S.C.A. § 77b(3) and discussion in subsection 2, *infra.*

5. If First American is deemed a "seller," in order for liability to arise under section 12(2) Ryder must additionally show that First American made an untrue statement of material fact or omitted to state a material fact necessary to make the statements it made not misleading in its offer or sale of the Integrated paper to Ryder.

6. A few years ago, the Supreme Court denied a petition for certiorari in *Davis v. Avco Fin. Serv., Inc.,* 739 F.2d 1057 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985), a case in which the Sixth Circuit noted that the Court has never passed on the definition of "seller" in section 12(2).

7. The Supreme Court has frequently observed that the provisions of the Securities Acts were "enacted to protect against fraud and promote the free flow of information in the public dissemination of securities." *Rubin v. United States,* 449 U.S. 424, 431, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981) (citations omitted).

8. *See Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3d Cir.1979); *Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1226 (7th Cir.1980).

9. *See Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 85 (2d Cir.1988) (recognizing liability for nonselling collateral participants who possess the requisite scienter); *Pharo v. Smith,* 621 F.2d 656, 664–68 (5th Cir.1980) (The proper test for section 12 generally "lies between the antiquated 'strict privity' concept and the overbroad 'participation' concept which would hold all those liable who participated in the events leading up to the transaction," and thus focuses on whether "the injury to the plaintiff flow[ed] directly and proximately from the actions of this particular defendant.") (citation omitted); *Davis v. Avco Fin. Serv.,* 739 F.2d 1057, 1063–68 (6th Cir.1984) (adopting proximate cause test under section 12 generally); *Lawler v. Gilliam,* 569 F.2d 1283, 1287 (4th Cir.1978) (Under section 12(1), "[l]iability may be imposed on any person who actively solicits an order, partici-

fine the class of participants who, albeit not owners of the securities, could nevertheless be liable under section 12(2). *Quincy Co-operative Bank v. A.G. Edwards & Sons, Inc.,* 655 F.Supp. 78, 83 (D.Mass. 1986). *See also Davis v. Avco Financial Serv.,* 739 F.2d 1057, 1063–67 (6th Cir.1984) (discussing the various approaches). Those circuits who did not require privity under section 12(2) varied on how far the ambit of that statute extended, even when employing the same test.

This circuit's most recent interpretation of section 12(2) dates back to 1985, before the Supreme Court issued *Pinter.* In *Foster v. Jesup and Lamont Securities Co., Inc.,* 759 F.2d 838 (11th Cir.1985), this court stated that "[s]ection 12 will reach those 'whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.'" *Id.* at 844 (quoting *Pharo,* 621 F.2d at 667). Secondary participants who did not effectuate the sale could be liable if a plaintiff's injury flowed directly and proximately from their actions, *i.e.* they were "key participants," "active negotiators," or "the motivating force" behind a sale of securities. *Foster,* 759 F.2d at 844 (citing *Junker v. Crory,* 650 F.2d 1349, 1360 (5th Cir.1981); *Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680, 693 (5th Cir.1971)).

In *Foster,* the defendant underwriter's name was prominently displayed on the offering document the seller of securities gave to the plaintiff. The underwriter and the seller of securities had entered into an agency agreement whereby the underwriter promised to use its "best efforts" to sell interests in a limited partnership in exchange for a 10% commission; however, that agreement was subsequently rescinded. While the plaintiff bought his interest in the partnership from the president of the

general partner in the limited partnership and the defendant underwriter sold no interests in the partnership to anyone, the evidence established that the plaintiff relied on the fact that the underwriter's name was displayed on the offering document. The *Foster* court nevertheless held that such reliance was not enough to constitute a "substantial factor" in the sale of a security. *Foster,* 759 F.2d at 845. Otherwise, all underwriters would always be potentially liable under section 12 simply by virtue of their status—an outcome not justified by the language of the securities provision at issue. *Id.*

In our case, the district court did not follow *Foster's* test for section 12(2) status, choosing instead to adopt *Pinter's* definition of "seller" as determined under section 12(1). In *Pinter,* the Court held that liability extends beyond those who pass title to a security, thus rejecting the privity requirement adopted by the Third and Seventh Circuits. The Court recognized that "[i]n common parlance, a person may offer or sell property without necessarily being the person who transfers title to, or other interest in, that property." *Pinter,* 486 U.S. at 642–43, 108 S.Ct. at 2076. Rather than relying entirely on ordinary understanding of the statutory language, however, the Court's analysis in *Pinter* was based principally on the meaning of the language of section 12(1) as set forth in the corresponding definitions in section 2(3) of the 1933 Act.

As stated in footnote 1, *supra,* section 12(1) makes a person liable for the "offer or sale" of an unregistered security. Section 2(3) defines "sale" or "sell" to include "every contract of sale or disposition of a security or interest in a security, for value," and the terms "offer to sell," "offer for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C.A.

pates in the negotiations, or arranges the sale," but "the definition excludes persons who executed an unsolicited order or whose minor role in the transaction shows that they have no causal connection with it."); *Anderson v. Aurotek,* 774 F.2d 927, 930 (9th Cir.1985) (Liability under section 12 depends on whether the acts of the participants are "both necessary to and a substantial factor in the sales transaction."); *Stokes*

*v. Lokken,* 644 F.2d 779, 785 (8th Cir.1981) (employing substantial factor test).

At one time some courts gave section 12(2) an extremely broad reading and held that anyone who participated to any degree in the sale of a security by means of negligent misrepresentations may be considered a "seller" thereunder. This view has been abandoned. *See SEC v. Murphy,* 626 F.2d 633, 650 n. 18 (9th Cir.1980).

§ 77b(3). According to this language, the *Pinter* Court concluded that participants in the transfer of securities who "solicit" a purchase may also be liable as "sellers" under section 12(1) of the 1933 Act—even though they do not own the securities. *Pinter,* 486 U.S. at 644, 645, 108 S.Ct. at 2077, 2077. While the Court declined to expressly define "solicit," it explained that a participant whose motivation is solely to benefit the buyer cannot be deemed to have solicited a purchase. Instead, liability extends only to one who solicits a purchase *and* is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2079.

### 2. The Scope of Section 12(2) After *Pinter*

On appeal, Ryder argues that sound policy and statutory interpretation require that the definition of "seller" used in Section 12(2) cases be broader than the *Pinter* definition for section 12(1) cases. In particular, appellant differentiates section 12(1) which imposes strict liability from section 12(2) which allegedly requires a showing of negligence. *Compare Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 689 (3d Cir.1991) (section 12(2) makes actionable negligent misrepresentation); *Casella v. Webb,* 883 F.2d 805, 809 (9th Cir.1989) (Based on section 12(2)'s language, "[s]ellers may defeat recovery only by proving they did not know 'and in the exercise of reasonable care could not have known' of the untruth or omission.") *with Pharo,* 621 F.2d at 665 n. 6 ("Though the cases and the commentators interpret sections 12(1) and 12(2) as strict liability statutes, a plausible argument can be made that the latter statute is not."). Thus, Ryder asserts that the broader substantial factor test of *Foster* should still apply to determine the ambit of section 12(2); and, under that test, whether First American was a substantial factor in the sale of the commercial paper to Ryder

is an issue of fact, inappropriate for summary judgment according to plaintiff.

Although the *Pinter* Court expressly declined to "take a position on" the meaning of "seller" within section 12(2), it conceded in dicta that most courts and commentators give the term the same meaning as in section 12(1).[10] 486 U.S. at 642 n. 20, 108 S.Ct. at 2076 n. 20. Thus the Court found that the decisions under § 12(2) addressing the "seller" question were relevant to the scope of section 12(1). *Id.* Moreover, and most important, it observed that the operative language of the two sections was identical.

The language of securities provisions comes first in interpreting their respective scope and meaning. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). The statute at issue uses identical language in sections 12(1) and 12(2) to indicate (i) the person(s) who may be held liable ("any person who ... offers or sells a security"), (ii) the person(s) who may sue ("the person purchasing a security from him"), and (iii) the remedy available if the statute is violated ("recover the consideration paid for such security," or "damages if he no longer owns the security"). 15 U.S.C. § 77*l*(1)–(2). *See also Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 536 (9th Cir.1989) ("It is plain from the statute that the word 'offers' means the same thing in both sections."). Without differentiating between subsections, the Court stated: "The inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12." *Pinter,* 486 U.S. at 643, 108 S.Ct. at 2076. According-

---

**10.** *See, e.g., Pharo v. Smith,* 621 F.2d 656, 666–67 (5th Cir.1980); *Schillner v. H. Vaughan Clarke & Co.,* 134 F.2d 875, 878 (2d Cir.1943) ("Clearly the word [sell] has the same meaning in subdivision (2) as in subdivision (1) of section 12."); Schneider, *Section 12 of the Securities Act of 1933: The Privity Requirement in Contemporary Securities Law Perspective,* 51

*Tenn.L.Rev.* 235, 261 & nn. 144–45 (1983–1984). *But see Pharo,* 621 F.2d at 666 n. 7 (quotation omitted) ("[T]he term 'seller' has sometimes been accorded a broader construction under Section 12(2) than under Section 12(1)...."); Peterson, *Recent Developments in Civil Liability Under Section 12(2) of the Securities Act of 1933,* 5 *Houston L.Rev.* 274, 276–81 (1967).

ly, based on the statutory language, we find that a "solicitor" of a purchase of securities he or she does not own is within the ambit of either section 12(1) or section 12(2).

As with section 12(1), there is no support in either the statutory language or legislative history for expansion of section 12(2) liability beyond persons who pass title or "offer" securities, including those who "solicit" offers for their own benefit or that of the securities owner. Much of the same reasoning the Supreme Court used to reject the substantial-factor test as employed by the Fifth Circuit (*See Dahl v. Pinter,* 787 F.2d 985 (5th Cir.1986)) to determine section 12(1)'s scope, also applies to whether that test has continued validity under section 12(2):

> The deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme. Those courts that have adopted the approach have not attempted to ground their analysis in the statutory language. See n. 25, *supra.* Instead, they substitute the concept of substantial participation in the sales transaction, or proximate causation of the plaintiff's purchase, for the words "offers or sells" in § 12. The "purchase from" requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser. The substantial-factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances.

486 U.S. at 651, 108 S.Ct. at 2080–2081. For the same reasons the *Pinter* Court enunciated with regard to section 12(1), we have heretofore held that privity is not required under section 12(2). At the same time, however, we recognize that the "purchase from" requirement and the limitation of participants to those who "solicit" a purchase of securities (statutory restrictions which apply to section 12 generally) narrow the field of potential sellers to a greater degree than that required by the substantial factor test on its face.

In other words, even though the substantial factor test as applied to section 12(1) encompasses persons who pass title and who solicit the purchase of unregistered securities as statutory sellers, that test could extend the statute's scope to include participants only remotely related to a sale transaction, such as lawyers and accountants whose involvement is that of merely providing professional services. *Pinter,* 486 U.S. at 651, 108 S.Ct. at 2081. "The buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person." *Id.* Nor do such participants "solicit" the purchase of securities as that word is understood "in common parlance."

We conclude that this circuit's use of the "substantial factor" test must be modified to comport with *Pinter* and its emphasis on statutory language.[11] As a practical matter, the difference between the two tests may not have much effect in this circuit because some form of solicitation has usually been required under the substantial factor test, at least in the more recent cases, before imposing liability on a partici-

---

**11.** Since *Pinter,* all the courts that we are aware of which have again considered the scope of section 12(2), have used or adopted the definition of seller as enunciated in *Pinter.* In doing so, these courts have modified any previously inconsistent case law. *See Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 536 (9th Cir.1989) (substantial factor test reformulated in light of *Pinter* which applies to section 12 generally); *Crawford v. Glenns, Inc.,* 876 F.2d 507, 510 (5th Cir.1989) (substantial factor test reformulated in light of *Pinter*); *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 635 (3d Cir.1989) (test for 12(2) status reformulated to abolish privity requirement and conform with *Pinter's* test for 12(1) status); *Wilson v. Saintine Explo-*

*ration & Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989) (*Pinter,* which this court has held applies to section 12 generally, in part expands and in part contracts the category of persons potentially liable under Second Circuit case law); *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 940 (7th Cir.1989) (*Pinter* "seems to undermine the continuing viability of [our Circuit's] strict privity requirement concept under section 12(2)."); Note, *Applying Section 12(2) of the 1933 Securities Act to the Aftermarket,* 57 *U.Chi. L.Rev.* 955, 963 (1990) ("[I]t is not surprising that all courts that have considered the question have applied the *Pinter* standard of "seller" to § 12(2).") [hereinafter *Applying Section 12(2)* ].

pant who does not own the securities being sold. *See, e.g., Hill,* 448 F.2d at 693 (defendants sought out and trained the original incorporators to solicit additional capital for the corporation, provided sales brochures to secure the capital and rendered advice on the corporation's development, in effect doing "everything but effectuat[ing] the sale"); *Junker,* 650 F.2d at 1360 (at shareholders' meeting defendant lawyer "urged" approval of merger between two related companies and thus was an "active negotiator"). *Cf. Foster,* 759 F.2d at 846 (underwriter not held liable because did not attempt to persuade plaintiff to buy, and plaintiff obtained independent advice); *Croy v. Campbell,* 624 F.2d 709 (5th Cir. 1980) (lawyer not held liable for recommending investment because he made no representations concerning project's advisability, did not prepare sales brochure, and did not attempt to persuade the plaintiffs to invest).

Nevertheless, the *Pinter* Court took great pains to emphasize that the substantial factor test, on its face at least, is a departure from the scope of the statutory language of section 12(1); that conclusion applies to the identical operative language in section 12(2). The Court also pointed out that the substantial factor test incorporates the tort law doctrine of proximate cause and in the process "introduces an element of uncertainty into an area that demands certainty and predictability." *Pinter,* 486 U.S. at 652, 108 S.Ct. at 2081. Although the *Pinter* test is not itself a model of clarity, our duty is to apply it as faithfully as we can. Further, it does provide clearer guidelines and offers more predictive value to participants in securities transactions than do previous section 12(2) tests used by the circuits, including this one, which have not required privity as a basis for liability.

We find that applying *Pinter* to section 12(2) is also consistent with that statute's relationship to the other provisions and underlying policies of the statutory scheme

Congress has provided for the protection of investors in securities. As with section 12(1), the scope of other relevant provisions of the 1933 Act has been determined principally by examining their respective statutory language in conjunction with the definitions in section 2(3). For example, "the Court has made clear, in the context of interpreting § 17(a) of the Securities Act, 15 U.S.C. § 77*l* (a), that transactions other than traditional sales of securities are within the scope of § 2(3) and passage of title is not important." *Pinter,* 486 U.S. at 643, 108 S.Ct. at 2076 (citing *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979)). In *Naftalin,* the Court stated that "[t]he statutory terms ["offer" and "sell"], which Congress expressly intended to define broadly, ... are expansive enough to encompass the entire selling process, including the seller/agent transaction." *Id. See also Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) ("[I]t is not essential under the terms of the Act [section 2(3) ] that full title pass to a transferee for the transaction to be an 'offer' or a 'sale.'") (citation omitted). The Court determined its reading of section 17(a) of the 1933 Act in *Rubin* to be "wholly consistent with the history and purposes of the Securities Act of 1933." *Id.*

Extending or contracting the application of a statute is most acceptable when it does not upset an entire statutory scheme, render other provisions superfluous, or create statutory gaps Congress intended to fill.[12] In contrast to other provisions, "§ 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale." *Pinter,* 486 U.S. at 650, 108 S.Ct. at 2080 (citing to 15 U.S.C. § 77b(11), section 5[2] of the 1933 Act; 15 U.S.C. § 78i(e), section 9 of the 1934 Act; and 15 U.S.C. § 77k, section 11 of the 1933 Act, as examples of Congress' awareness of the collateral participation concept). "The fact that Congress made

---

12. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210, 96 S.Ct. 1375, 1389, 47 L.Ed.2d 668 (1976) (rejecting contention that proof of negligence suffices for an action under 10(b) or Rule 10b–5 in part because such an extension

would "nullify the effectiveness of the carefully drawn procedural restrictions" on the express civil provisions of sections 11, 12(2) and 15 of the 1933 Act).

every underwriter liable in § 11, but not in § 12, suggests that underwriters are not to be liable under § 12 solely by virtue of their status as underwriters." *Foster*, 759 F.2d at 845. Likewise, 12(2) liability should not be imposed upon banks for collateral participation in a securities transaction or merely because of their status.

We do not shun Ryder's argument that section 12(2)'s scope ought to be broader than that of section 12(1), since its language indicates that negligence is required as opposed to strict liability under section 12(1), even though other circuits have rejected the same argument in light of *Pinter. See, e.g., Moore*, 885 F.2d at 536; *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1115 (5th Cir.1988). We note, however, that because the two provisions cover different aspects of a securities transaction and yet retain the same purpose, it is not illogical or inconsistent for them to prohibit the same conduct and thus have an identical scope. Section 12(1) creates liability for the sale of unregistered securities, while section 12(2) creates liability for omissions and misrepresentations in a prospectus or oral communication. Yet both sections were enacted to promote full and fair disclosure of information to potential buyers of securities. "The shared purpose of these sections strengthens our conclusion that *Pinter*'s reasoning applies equally to both sections." *Moore*, 885 F.2d at 536.[13] And, as noted elsewhere, the "purchased from" and "solicitation" restrictions which *Pinter* emphasized in defining the ambit of section 12(1) apply equally to section 12(2). If Congress intended that section 12(2)'s scope be broader than that of section 12(1) it could have said so.

Moreover, we are quite convinced that section 10(b) of the 1934 Act, the "catch-all" anti-fraud provision, and its accompanying Rule 10b–5 adequately fill any gaps created by applying *Pinter* to section 12(2). While a Rule 10b–5 misstatement or omission must be made knowingly, a section 10(b) action can be brought by a purchaser or seller of "*any* security" against "*any*

person" who has used "*any* manipulative or deceptive device" in connection with the purchase or sale of securities. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (quoting 15 U.S.C. § 78j) (emphasis in original). There need not even be an identifiable party to whom the misstatement or omission is directed, as long as a trade takes place and influences the marketplace. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 861–63 (2d Cir.1968). Ryder chose, however, not to pursue a 10b–5 claim even though it claims that First American had knowledge of Integrated's deteriorating financial condition.

Ryder also argues that section 12(2) ought to be interpreted "broadly and liberally" in order to provide adequate protection to the investing public. *See Rubin*, 449 U.S. at 431, 101 S.Ct. at 702. "The ultimate question is one of congressional intent," however, which we believe is served by applying *Pinter* to section 12(2), and "not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979). While the Supreme Court has indicated that the remedial purpose of the securities laws is not to be ignored in a court's interpretation of securities laws, *Herman & MacLean*, 459 U.S. at 386–87, 103 S.Ct. at 689, "generalized references to the 'remedial purposes' of the 1934 Act will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.'" *Touche Ross*, 442 U.S. at 578, 99 S.Ct. at 2490 (citation omitted). In short, we do not find persuasive Ryder's argument that a more liberal interpretation of the term "seller" in section 12(2) is necessary to comport with either that section's standard of liability or the general remedial purposes of the 1933 Act.

Lastly, we note that applying *Pinter* to section 12(2) is consistent with relevant banking law and industry custom. With

---

**13.** *Cf. Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (section 10(b) is applicable to conduct covered by section 11 of the 1933 Act because the differ- ent standards of liability for those provisions, *i.e.* scienter under section 10 and negligence under section 11, would prevent such a construction from making section 11 superfluous).

regard to industry custom, "banks currently offer, as an accommodation to their customers, brokerage services that are virtually identical to the services offered by Schwab," or any other securities firm that engages solely in retail discount brokerage.[14] *Securities Indus. Ass'n v. Board of Governors of the Federal Reserve Sys.,* 468 U.S. 207, 211–12, 104 S.Ct. 3003, 3007, 82 L.Ed.2d 158 (1984). Congress endorsed this traditional banking service in 1933. Section 16 of the Glass–Steagall Act, enacted as part of the Banking Act of 1933, authorizes banks to continue the practice of "purchasing and selling ... securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for [their] own account[s]." 12 U.S.C.A. § 24 Seventh. *See also* 48 Fed. Reg. 37006 (1983) (Banks may engage in "buying and selling securities solely as agent for the account of customers," but may not engage in "securities underwriting or dealing or investment advice or research services."). We find that applying *Pinter* to section 12(2) is consistent with the Glass–Steagall Act.[15]

### 3. Application of *Pinter* and Section 12(2) to First American

In applying *Pinter* and the foregoing legal principles to the securities transactions at issue,[16] we conclude that First American cannot be held liable under section 12(2) in light of the undisputed facts here. The record clearly shows and Ryder admits that First American did not own or hold the Integrated commercial paper bought by Ryder prior to or at the time Case told First American to buy the paper for Ryder. The Integrated paper was "bearer" paper. It was not registered in either defendant or plaintiff's name. Further, the trade dates and the settlement dates were the same, all of which evidences that there never was any ownership by defendant subsequent to the purchases. Based on Wallace Case's affidavit, the securities he selected on behalf of Ryder were purchased pursuant to his orders only. First American would then hold the securities in safekeeping until they matured or Case gave further instructions. Case Affidavit at ¶ 4 (Sept. 19, 1990). Leo Krupp, Ryder's business consultant, stated: "I know its not their [First American's] inventory because we picked the date and the maturity." Krupp Depo. at 72 (July 26, 1990).

Ryder nevertheless argues that based on the language of the confirmation slips for the two purchases, a jury could have reasonably inferred that First American

**14.** Unlike Schwab, the majority of securities firms engage in all facets of securities transactions, acting at times as underwriters, dealers or brokers. As an underwriter and dealer, a securities firm buys and sells securities on its own account. It thus owns the securities and assumes all risk of loss. As a broker, the firm typically buys and sells securities as an agent for the customer. As noted elsewhere, the broker who acts as an agent for the buyer never has title, but merely executes the customer's orders. The customer thus has the risk of loss. For more discussion on the distinction between brokers and dealers, see Douglas & Bates, *Stock "Brokers" and Agents and Dealers,* 43 *Yale L.J.* 46 (1933).

**15.** We recognize that presently pending before Congress is a bill, the Proxmire Financial Modernization Act of 1991, S263, which would repeal the provisions of the Glass–Steagall Act that bar affiliations between investment banking and commercial banking firms. Reduced to its essence, the bill permits a bank's securities affiliate that has Federal Reserve approval and is registered with the SEC to underwrite, distribute, and deal in most types of debt. The affiliate may also engage in brokerage, private placement, investment advising and other securities activities that are permissible for SEC-registered broker-dealers. Whatever final effect that bill may have, however, the Glass–Steagall Act as presently amended remains the applicable banking law for this case.

**16.** We note that neither party has raised or briefed the issue of whether section 12(2) extends to aftermarket transactions. The courts which have considered the issue, the great majority of which are on the trial level, are split. Note, *Applying Section 12(2), supra* note 11, at 957–58. *But see Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 689 (3d Cir.1991) ("Interpreting section 12(2) so that 'oral communication' refers to both initial and secondary trading, then, would create an anomaly in that sellers in the aftermarket would be liable only for oral and not written misrepresentations because the term 'prospectus' is limited to initial offerings."). Given our disposition of the case we leave the issue unresolved.

gained and then passed title to the Integrated paper to Ryder. Those slips, prepared by defendant, stated in part: "As *agent* We Have *Sold* To You...." (emphasis added). While the language uses the word "sold," by also using the words "as agent" the language at best cuts both ways, and certainly does not negate the strength of the other evidence previously mentioned. We find that the evidence as a whole clearly establishes an agency relationship between the bank and Ryder.

When a broker is an agent of the purchaser of the securities, he is in reality *buying* on behalf of the purchaser (rather than *selling* on behalf of the owner if he were an agent of the owner). *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1228–29 (D.D.C.1988) ("Although it has been held that a 'seller' under § 12(2) is not necessarily just a person who conveys title and no one else, there is no reading of the statute that would broaden its application to the broker/defendant who *buys* on behalf of a customer/plaintiff.") (emphasis in original). "[A] broker executes orders for the purchase or sale of securities solely as agent," and if done on behalf of the buyer "it is the customer, rather than the [bank] who bears the risk of loss." *Securities Indus. Ass'n*, 468 U.S. at 218 & n. 18, 104 S.Ct. at 3009 & n. 18. We note that "risk of loss" is one of the criteria for determining ownership. As we find that First American did not pass title to the Integrated paper, something more than simple execution of Ryder's orders is required for defendant to fall within the ambit of section 12(2).

As stated previously, with participants who do not own the securities, *Pinter* extends (and limits) liability "to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interest or those of the securities owner." 486 U.S. at 647, 108 S.Ct. at 2079. That case sets forth a two part test for these participants: "First, whether the participant in the sale 'solicited' the purchase; and second whether the participant or the owner of the security sold benefited." Reece, *Would Someone Please Tell Me the Definition of the Term 'Seller': The Confusion Surrounding Section 12(2) of the Securities Act of 1933?*, 14 *Del.J.Corp.L.* 35 (1989). *See, e.g., Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir.1989) (lawyers should not be exempt from section 12(2) liability where they earn a commission from an actual seller for persuading their clients to make a particular investment).

Undoubtedly, First American offered the Integrated paper because it was motivated by its own financial interest, however great or small that was. Certainly it expected to profit from its business dealings with Ryder and from the services it provided. The issue in this case, however, is the first prong of the *Pinter* test, *i.e.* whether there was actionable solicitation by First American. Based on *Pinter*, without some solicitation on the part of a broker who acts as an agent of the buyer we may not impose liability under section 12(2). Even a seller's agent must solicit the purchase before section 12 applies, although we note that in contrast to a *buyer's* agent it would be uncommon for a *seller's* agent not to engage in solicitation if he or she is hired to sell a principal's securities. *Cf. Pinter*, 486 U.S. at 646, 108 S.Ct. at 2078 ("It has long been 'quite clear,' that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller."); *Cady v. Murphy*, 113 F.2d 988, 990 (1st Cir.1940) (broker who acted as agent of seller, or as agent for both seller and buyer, could be liable as statutory seller under section 12(2)).

The substance of the communications between Wallace Case and Mike Casey (the parties to the two transactions at issue), is not in dispute and reveals that Casey (working for First American) only executed Ryder's orders. Casey did not actively solicit the orders, *i.e.* "urge" or "persuade" Case (working for Ryder) to buy Integrated paper. *See Pinter*, 486 U.S. at 644, 647, 108 S.Ct. at 2077, 2078. For example, Case stated in his affidavit, *"[h]aving made my decision,* I would then call Mike Casey at First American and place an order." Case

Affidavit at ¶ 4 (emphasis added). Leo Krupp, retained by Ryder to help Case, likewise testified that Ryder through Case "instructed the bank" to purchase the commercial paper. Krupp Depo. at 72. Krupp stated that Integrated paper was part of the regular pieces of commercial paper that the bank had to offer, and that Case "had heard about the company before and he decided to buy it." *Id.* at 98–99. Mike Casey testified that, after some initial investigation, Case "then instructed me to purchase Integrated Resources commercial paper for Ryder." Case Affidavit at ¶ 6.

The only evidence suggesting that First American solicited the purchase of Integrated paper from Ryder is based on Frank Ryder's own deposition. He testified that Wallace Case had told him "that the bank had recommended [Integrated paper] to him to purchase, and that is why he had purchased that particular paper." Ryder Depo. at 141 (July 16, 1990). *See also* Ryder Depo. at 92 (Frank Ryder terminated Wallace Case in part because he discovered Case had allowed First American to "talk him into buying" Integrated paper).

Even with all reasonable inferences drawn in favor of Frank Ryder, however, we do not find a genuine factual dispute. The affidavit of Wallace Case, an interoffice memo from Case while still employed by Ryder, Krupp's deposition, Mike Casey's affidavit, and Ryder's practice in making investments through other institutions, all establish that the bank did not specifically recommend or "talk Ryder into buying" Integrated paper. For example, it is evident both Wallace Case and Mike Casey understood that Case would make up his own mind on which securities would be appropriate to purchase. Case's affidavit states in pertinent part:

> There was nothing extraordinary or unusual about these purchases. On each occasion I spoke with Mike Casey and Mike Casey made no representations or statements to me other than to state the securities available, their maturities and their rates. On each occasion I could have chosen other securities and commercial paper issues by companies such as GMAC, John Deere and Chrysler. *On each occasion there was nothing Mike*

> *Casey did or said which caused me to select Integrated Resources commercial paper over that issued by other companies.*
>
>     *     *     *     *     *     *
>
> During the period that I was responsible for making Ryder's investments *I never instructed any representative of First American to render investment advice* or to exercise discretion and to make the investment decision for Ryder. My transactions on behalf of Ryder with SouthTrust and Central Bank were very similar to what is described in this paragraph. SouthTrust and Central did not make recommendations or render investment advice to me and I did not rely upon these banks to do so. I am not aware of any bank that provides information concerning one customer to another customer for the purpose of encouraging or discouraging a particular investment.

Case Affidavit at 5 (emphasis added). We point out that Ryder chose not to depose Wallace Case, nor to elicit his testimony. Mike Casey's affidavit is substantively similar to and supports Wallace Case's affidavit insofar as the two transactions at issue are concerned. *See* Casey Affidavit at ¶ 4 (September 19, 1990).

As noted elsewhere, Case clearly had full authority to make investments and was not required to come to Frank Ryder before he made any type of investment. Ryder Depo. at 76, 86–87. Given Case's control over Ryder's investment decisions, it was basically immaterial to Casey or First American which particular paper was purchased. If Ryder had originally conceived that those decisions be vested in First American, clearly the practice had changed well before the challenged transactions took place.

The evidence as a whole does not indicate that First American "actively" solicited Ryder for the purchase of Integrated paper. Moreover, the fact that Integrated paper had a higher yield than the other available investments should not be deemed an "implied" solicitation (as urged by appellant), assuming *arguendo* that such solicitation is enough to impose section 12(2) liability.

After all, the availability and disclosure of other investments to Ryder for its purchase may "imply" that First American did not care which investment Ryder chose.[17] Indeed, the few hundred dollars of commissions gained by First American on a sale of $400,000 worth of Integrated paper buttresses Wallace Case's testimony that First American had no more motivation to sell Integrated paper than other investments. According to Mike Casey, Case "was usually interested in purchasing the investment with the highest yield." Casey Affidavit at ¶ 3. No evidence contradicts that assertion. In addition we should point out that Integrated paper bore the same A2 rating (until downgraded in June 1989) as other commercial paper Case bought through SouthTrust "on at least twenty-five occasions." Case Affidavit at ¶ 8. In fact, Case believes he "bought Integrated Resources probably ... in comparison to a rate for Deere and Chrysler who are also A2P2 rated." Case Memo at 2 (June 21, 1989).

Likewise, the fact that Wallace Case received $250 per quarter for serving on the First American "North Alabama Advisory Committee," for the purpose of advising First American with respect to new business opportunities in North Alabama, does not imply that First American solicited Ryder to purchase Integrated paper. "No representative of First American ever used the subject of the Committee or an actual Committee meeting to encourage, recommend, request or demand that I purchase a specific security or take any other action in connection with the bank/customer relationship between First American and Ryder." Case Affidavit at ¶ 11. At the time Case received his quarterly fees for his services on the North Alabama Advisory Committee he was making $69,000 per year; no evidence in the record suggests that the few hundred dollars he received from First American motivated him to buy Integrated paper.

Finally, First American's ongoing creditor-debtor relationship with Integrated does not imply, in-and-of itself, that the creditor was soliciting sales of securities to benefit the debtor. To be sure, the potential of First American for irresponsible financial dealing because of its loan transactions with the note issuer throws a difficult element into this case, and prevents us from holding that a bank which acts as an agent of the buyer and refrains from actively soliciting the purchase of securities owned by other institutions is generally not within the class of parties which are included in the definition of seller for purposes of section 12(2). For instance, the legislative history of the Glass–Steagall Act, which was enacted in the same year as the Securities Act of 1933, reveals a concern for banks which engage in investment-banking activities that are fundamentally incompatible with commercial banking.[18] While that

---

**17.** Ryder admitted that it was the only customer of First American that held Integrated paper when the default occurred and that First American did not sell that investment to anyone else between January 1, 1988 and the first sale made to Ryder. This belies the inference that the bank was aggressively selling the paper or urging Ryder and/or other institutions to purchase the paper.

**18.** Congress "expressed concern that the involvement of a commercial bank in particular securities could compromise the objectivity of the bank's lending operations." *Securities Indus. Ass'n v. Board of Governors of the Federal Reserve Sys.*, 468 U.S. 137, 146, 104 S.Ct. 2979, 2984, 82 L.Ed.2d 107 (1984) (citation omitted). However, as translated into the legislative language of the Glass–Steagall Act, that concern appears to have been limited to circumstances where banks might make unsound loans to companies in whose securities they had a stake or to a purchaser of securities that the bank seeks to distribute. *Id.* at 147, 154–56, 104 S.Ct. at 2984, 2988–89. Here, First American did not underwrite the Integrated commercial paper; it had no personal stake in the security (besides making a commission on its sale); and, it did not buy up some of the paper for its own account as an attempt to shore up the issuer.

In fact, the record reveals that generally, and certainly with regard to the parties here, First American's right hand (loan department) had little notion of what its left hand (securities department) was doing. It does appear that at least one of the employees in First American's loan department from time to time referred some customers to the Capital Markets Division where Mike Casey worked. DeWitt Depo. at 19. DeWitt, however, had no knowledge of the policies and procedures of the Capital Markets Division insofar as the type of investments that it would offer its customers. *Id.* at 20–21.

legislative history does not specifically refer to the circumstances of this case, there is at the very least a potential conflict of interest in this case.

At the same time, however, First American has done nothing which evidences misconduct intended to be reached by the securities laws as they have been interpreted by the Supreme Court in *Pinter* and other relevant cases. The securities laws were enacted in large part to curb conflicts of interest created by the combination of banking and securities activities. *See* 134 Cong.Rec. §§ 3360, 3381 (1988). Assuming First American's conduct is prohibited neither by the securities laws nor by applicable banking law, then no legal recourse exists for the potential conflict of interest here. As the district court put it, "[t]here is no reason to think that a bank, which is not allowed to 'solicit' security purchases within the context of the [provisions of the Glass–Steagall Act], is a solicitor under § 12(2) if it acts consistently with those laws."

Moreover, we note that the Glass–Steagall Act does not establish complete separation between banking and securities activities. Despite its lending relationship with Integrated dating back to 1984, First American was not so closely aligned with that institution that it was in effect acting as both agent of the buyer and seller and thus indirectly soliciting the purchase of Integrated paper from Ryder to help protect its investment. *See Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) ("Brokers have been held liable as 'sellers' only in those cases where they were closely aligned with the title-holding parties or worked as agents of the securities issuers.") (citing *Pinter* and other cases).

All brokers generally solicit business. The *Pinter* Court, however, focused on the solicitation "directed at producing the sale" because it is at this stage that "an investor is most likely to be injured, that is, by being *persuaded* to purchase securities without full and fair information." *Id.* 486 U.S. at 646–47, 108 S.Ct. at 2078 (emphasis added). Ryder has not shown that First American persuaded Case to purchase Integrated paper. This case "is more similar to

*Croy v. Campbell,* in which the defendant *did not attempt to persuade the plaintiff to buy,* and in which the plaintiff invested his money only after meeting the developer himself and *otherwise obtaining independent advice." Foster,* 759 F.2d at 846 (citation omitted) (emphasis added). *See also Canizaro v. Kohlmeyer & Co.,* 370 F.Supp. 282, 287 (E.D.La.1974), *aff'd* 512 F.2d 484 (5th Cir.1975) (no liability under section 12(2) because the defendant "merely 'checked the deal out,' answered several of Canizaro's questions as requested and, then, advised Canizaro that based upon the information gathered, he could see no reason why Canizaro should not complete the transaction"). Accordingly, we hold that First American is not a "seller" for purposes of section 12(2).

## B. Did First American Make Any Untrue Statements or Fail to Disclose Material Omissions of Fact in Its Communications With Ryder?

Ryder's claim in essence states that First American had a duty not to offer Integrated paper to Ryder in light of its knowledge of Integrated's financial condition and Frank Ryder's investment guidelines. In addition to the requirement that the defendant be a "seller" of securities, section 12(2) imposes liability only upon one who sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l.* Based on Ryder's allegations and the record, we recognize that Ryder may have raised a genuine issue of material fact as to whether First American had knowledge of and omitted information regarding Integrated's financial condition in its communications with Ryder. As we find that First American is not a seller or offeror of securities for purposes of section 12(2), we decline to reach this issue.

### III.

In sum, we do not exclude the potential liability of a bank under section 12(2) where

the facts suggest the institution had a more active role in soliciting whatever transactions may be at issue. On the other hand, we do not believe that the language of section 12(2) and the fundamental policies of the securities laws contemplate an extension of that statute to this rather common situation where a bank acts solely on behalf of the customer to place his funds on direction for investment in stocks or commercial paper which is held and sold by other institutions. The grant of summary judgment is therefore AFFIRMED.