Myrtle P. STEWARD, Earline Odom, Cessa Sellers, Hugh Caffey, Jr., Hugh G. Rosell, Jr., Brooks Garrett, Plaintiffs–Appellants,

v.

CHAMPION INTERNATIONAL CORPORATION, Defendant–Appellee.

No. 91–7943.

United States Court of Appeals, Eleventh Circuit.

April 7, 1993.

Sidney H. Schell, W. Dewitt Reams, Mobile, AL, for plaintiffs-appellants.

G. Sage Lyons, Charles D. Miller, Mobile, AL, for defendant-appellee.

Before ANDERSON, Circuit Judge, MORGAN and JOHNSON, Senior Circuit Judges.

MORGAN, Senior Circuit Judge:

This case arises out of a breach of contract claim filed by plaintiffs-appellants involving the interpretation of a timber purchase agreement. The district court granted summary judgment in favor of the defendant-appellee. We REVERSE.

### FACTUAL BACKGROUND

On April 1, 1958, a timber purchase agreement (hereinafter "TPA" or "agreement") was entered into by and between Frank A. Steward and Lula Minnie Steward as "seller" and Saint Regis Paper Company as "purchaser". The agreement covered land in Escambia County, Alabama, and was for a term of 60 years, beginning April 1, 1958, and continuing until December 31,

2018. The plaintiffs-appellants in this action are the heirs and descendants of Frank A. Steward and Lula Minnie Steward under the contract. The appellee, Champion International Corporation (hereinafter "Champion") is the surviving corporation as the result of a merger with Saint Regis Paper Company, and as such was assigned the rights of Saint Regis Paper Company in the underlying TPA.

On December 31, 1988, Champion exercised its option to terminate the agreement early.[1] On June 15, 1990, the appellants filed the instant action alleging that Champion breached the TPA in that it did not leave a sufficient volume of timber on the property as required by the agreement and that Champion wrongfully cut and removed hardwoods as part of Champion's "timber backlog". On August 6, 1990, Champion filed a motion to compel arbitration asking the district court to order appellants to settle the claims underlying this action through arbitration as provided by the TPA.[2] Both parties agreed that arbitration was proper on the claim of whether Champion did in fact leave the proper volume of timber on the land upon termination of the agreement. However, the district court stayed the arbitrable claim pending resolution of the parties' cross-motions for summary judgment regarding the claims which were not subject to arbitration; namely, whether Champion was required to leave a volume of timber on the land, and whether Champion had the right to cut hardwood as part of the timber backlog. The district court granted summary judgment in favor of Champion on both issues.

## STANDARD OF REVIEW

■ As a threshold matter, we must review the district court's determination that the timber purchase agreement was unambiguous. Although neither party contends that the agreement is ambiguous, under Alabama law, the determination of whether a contract is ambiguous is a question of law for the court. *Terry Cove North, Inc. v. Baldwin County Sewer Auth., Inc.,* 480 So.2d 1171, 1173 (Ala. 1985). A question of law is subject to plenary review before this court. *Cathbake Investment Company, Inc. v. Fisk Electric Company, Inc.,* 700 F.2d 654, 656 (11th Cir.1983). When an agreement's terms are clear and certain, the court has the duty to determine the meaning of the agreement. *Terry Cove, supra.* The fact that the parties adopt conflicting interpretations of the contract in the throes of litigation does not create ambiguity where none exists. *Hill Air of Gadsden, Inc. v. City of Gadsden,* 467 So.2d 230, 233 (Ala. 1985).

■ Upon careful review, we agree with the district court that the TPA is unambiguous. The agreement states in clear and plain language that the rights and privileges of Champion to remove timber after termination of the agreement are governed by paragraph 1B. Paragraph 1B is just as clear in delineating what those rights are. The agreement does not become ambiguous simply because some of the relevant terms used in paragraph 1B are defined in other parts of the contract. We find that the relevant terms, as defined by the TPA, as well as the respective rights and obligations of the parties are unambiguous.

■ Having concluded that the TPA is unambiguous, the construction and effect of the agreement are questions of law which may be decided by summary judgment. *Warrior Drilling & Eng'g Co. v. King,* 446 So.2d 31, 33 (Ala.1984). Our review of a grant of summary judgment is plenary. *Ryder Int'l Corp. v. First Am.*

1. Under the terms of the TPA, Champion was granted the option of terminating the agreement early on December 31 of either 1968, 1978 or 1988, or of allowing it to expire on December 31, 2018.

2. Paragraph 6 of the TPA states:
"Should there at any time be any dispute between the seller and purchaser ... as to the average annual growth or reproduction of timber on said land, ... and said dispute is not settled by mutual agreement, then either party may notify the other party of the dispute ... and the arbitrators so appointed shall select a third arbitrator, and the decision of such arbitrators, or a majority of them, shall be final and binding upon the parties hereto."

*Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

## I. TIMBER VOLUME

The first issue this Court shall address is whether the TPA required Champion to leave a volume of timber on appellants' property after termination of the agreement. Appellants argue that the TPA provided, in essence, that upon termination of the agreement and return of the land to appellants, there would be a sufficient volume of pine timber on the property to produce an average annual growth of 1479 cords. Appellants contend that the volume of timber that could be cut by Champion was limited by the agreement to an amount that would not reduce the average annual growth to an amount less than 1479 cords of pine pulpwood. Appellants claim that Champion breached the TPA by failing to manage the land and timber so as to insure an annual growth of 1479 cords.[3] Champion responds that there is no provision in the contract imposing an obligation on Champion to leave any volume of timber on appellants' property.

■ The district court, in granting summary judgment in favor of Champion, relied heavily on the absence of any volume requirements in the termination clause of paragraph 1B.[4] The lower court reasoned that any volume requirements imposed under paragraph 4B were inapplicable in the event of termination under paragraph 1B. We do not agree. We conclude that the TPA imposed restrictions on the volume of pine timber which could be cut annually which had the effect of requiring Champion to leave the original volume of pine timber on the land after termination of the agreement.

■ Champion is correct in asserting that there are no express provisions directly imposing an obligation on Champion to leave a specific volume of pine timber standing. In fact, the agreement clearly allows Champion to cut and remove as much hardwood timber as it desired during the term of the agreement, consistent with the requirement to use good forestry practices.[5] Consequently, Champion was under no obligation to leave any volume of hardwood timber on the land upon termination of the agreement.[6] The same is not true with respect to pine timber. The TPA imposed specific restrictions on the amount of pine timber which could be cut and removed annually. By limiting the amount

3. Paragraph 5A states:
"[Champion] covenants and agrees that it will, at its own expense at all times during the term or life of this agreement, manage and operate said lands and the timber thereon in accordance with good forest practices from time to time prevailing, ... in such manner that the average annual growth or reproduction shall not be less than the amount of timber cut and removed or otherwise utilized annually."

4. Paragraph 4B states:
"[P]rovided, however, if the agreement is terminated under the provisions of Paragraph 1B, then the rights and privileges of [Champion] to remove timber and improvements shall be governed thereby."
Paragraph 1B states:
"[U]pon such date of termination, notwithstanding any provisions of this agreement to the contrary, all of the rights, privileges, obligations and licenses of the parties hereto, shall cease and terminate and both parties thereafter shall be released from the terms, provisions and obligations imposed upon them hereunder; ... provided, however, [Champion] during the period of twelve months thereafter, shall have the right, privilege and license to enter, cut and

remove or utilize any timber backlog existing at the time of such termination as above provided and ... in so doing shall use reasonable care to avoid damage to the timber volume remaining on the lands and shall exercise good forest practices in conducting such operations."

5. Paragraph 4D states:
"[Champion], in addition, may cut, remove and utilize pulping hardwood timber on the land in any quantities [Champion] may desire, paying thereof at the rate provided in Paragraph 2 hereof on the 15th day of the month succeeding that in which said hardwood is cut, ..."
Paragraph 5 states:
"There shall be no limitation as to the amount of hardwood timber that may be cut from the land."

6. Although Champion was not obligated to leave any volume of hardwood timber on the property; after the agreement was terminated, Champion's right to cut and remove any further hardwood timber was also terminated. Therefore, whatever volume of hardwood timber that existed at the time of termination should have been left intact by Champion.

of pine timber that could be cut and removed, the agreement prohibited Champion from reducing the original volume of timber.

Initially, Champion was required to purchase, and allowed to cut and remove, 1479 cords of pine pulpwood annually.[7] The annual purchase price was based on the estimated average annual growth of pine pulpwood as calculated by periodic cruises.[8] If the most recent cruise estimated the annual growth of pine timber to be less than 1479 cords, then Champion was restricted to cutting the lesser amount.[9] Likewise, if the estimated annual growth was greater than 1479 cords, then Champion was authorized to cut the greater amount.

The plain language of the TPA shows that the parties intended that Champion pay for, and be allowed to cut, the annual growth of pine pulpwood. The amount of pine timber which Champion had a right to cut and remove could never exceed the amount of pine timber estimated to be grown that year plus any uncut pine timber placed in the backlog and carried over from previous years. Since the subject property had a standing volume of pine pulpwood at the commencement of the contract and since Champion was only authorized to purchase and either harvest or place in its backlog the annual average growth of pine

pulpwood, then there must necessarily remain at the termination of the contract, a volume of pine pulpwood sufficient to maintain the estimated average annual growth of 1479 cords of pine pulpwood.

The TPA was similar to a trust fund where the beneficiary is entitled to withdraw the annual interest but cannot infringe upon the corpus of the trust. Each year the beneficiary can withdraw the interest earned or allow it to remain in the trust and grow, but the beneficiary can never withdraw more than the total accumulated interest. Likewise, each year Champion could cut and remove an amount of pine timber equal to the annual growth, or it could leave some or all of that amount on the land and allow it to grow. The annual growth, like interest rates, was subject to change from year to year. Nevertheless, Champion could not infringe upon or reduce the original volume of pine timber on the property.

We do not reach the issue of whether Champion did in fact leave the proper volume of pine pulpwood on appellants' property. Both parties agree that this issue is subject to arbitration under the TPA. However, the district court ruling implies that Champion's termination under paragraph 1B cured any defects which may

7. Paragraph 5 states:
Champion "shall have the right to cut and remove and otherwise utilize [1479] cords of pine pulpwood annually, or the number of cords of pine pulpwood estimated to be grown annually by the most recent cruise made hereunder, whichever is greater, during each succeeding calendar year of the term of this agreement, provided that said amount shall be subject to increase or decrease as herein provided."

8. Paragraph 4A states:
"During the year of 1964 and periodically each 5 years thereafter, a forest survey, or growth tabulation, shall be made and completed and an estimate of the anticipated average annual growth or reproduction of pulpwood (pine and pulping hardwood) on said lands and the amount thereof which [Champion] in the exercise of good forest practices may cut and remove therefrom (which said survey or tabulation shall hereinafter be called 'cruise'), shall be made by [Champion] at its expense. In estimating the average annual growth of pulpwood that can be cut and removed as above set forth, the cruise will contain an estimate as to the

amount of pulpwood that may be cut and removed from the land without reducing the average annual growth of timber during that and future years ..."
Although the type of pulpwood (pine or pulping hardwood) is not clearly delineated in the last sentence, we conclude that it must refer solely to pine pulpwood. The TPA clearly states that there were no limitations as to the quantity of hardwood that Champion could cut. Therefore the sentence can only make sense if the term "pulpwood" refers solely to pine pulpwood.

9. Paragraph 5 states:
"If during the last period specified above, the average annual growth or reproduction of the timber upon said lands fall [sic] below the said [1479] cords of pine pulpwood or the number of cords of pulpwood estimated to be grown annually by the most recent cruise hereunder, then the amount of pine timber which purchaser shall have the right to cut and remove or otherwise utilize shall be reduced to the amount of such average annual growth or reproduction of pine."

have existed at the time of termination. Termination under paragraph 1B released both parties from the "terms, provisions and obligations imposed upon them", but it did not excuse either party from responsibility for breach of the agreement which may have occurred prior to termination. We hold that if Champion did not leave a sufficient volume of pine pulpwood on the land at the time of termination of the TPA, then it was in breach of the agreement. Our holding should make clear that absent a breach of the TPA, there should be a sufficient volume on the property to maintain a growth of 1479 cords of pine pulpwood.

## II.  TIMBER BACKLOG

The second issue we address is whether Champion had the right, after the TPA was terminated, to cut and remove hardwood timber as part its timber backlog. After the agreement was terminated, appellants contend that Champion's rights were limited by the language of paragraph 1B to removing only its timber backlog. Appellants argue that the backlog consisted solely of timber "paid for but not cut", that only pine pulpwood was paid for in advance, and therefore, the backlog could only consist of pine pulpwood. Champion responds that there is no support for the proposition that it was limited to cutting only pine timber as part of its backlog and that appellants' reliance on paragraph 1B is misplaced. Since Champion had the right during the term of the agreement to reduce any existing backlog by cutting hardwood timber and since there were no limits as to the amount of hardwood timber that could be cut and removed, Champion claims that it had the right, under the terms of paragraphs 1B and 4D, to cut and remove either pine pulpwood or hardwood as part of its timber backlog.

On December 31, 1988, Champion exercised its option to terminate the TPA pursuant to paragraph 1B. The plain language of paragraph 1B shows that all rights, privileges and obligations under the agreement terminated with the agreement, with one exception. Champion was allowed to enter upon the land and cut and remove any existing timber backlog.[10] Since Champion clearly had the right to cut and remove any timber backlog existing as of December 31, 1988, we must therefore determine whether the timber backlog consisted of hardwood as well as pine timber.

In order to determine Champion's rights in reference to the timber backlog during 1989, we must look to the TPA to determine the definition of "timber backlog" and how the backlog was created. The TPA defines "timber backlog" as follows:

> "Should [Champion], during any one or more calendar years hereafter not cut, remove or otherwise utilize timber in the amount [Champion] is required to pay for with respect to such year, then [Champion] shall be entitled to cut, remove or otherwise utilize, during subsequent years, *the quantity of timber so paid for but not cut*, removed or otherwise utilized in prior years, which said quantity (sometimes herein *called "timber backlog" or "backlog")* shall be determined or based upon the purchase price hereunder of a cord of pulpwood...."
> (Paragraph 4B of the TPA) (emphasis added)

The TPA required Champion to pay, in quarter-annual installments, the purchase price of 1479 cords of pine pulpwood.[11] In

---

**10.** Paragraph 1B of the TPA contained the following termination clause:

"[Champion] is hereby granted the right to terminate this agreement on December 31st [1988] ... and upon such date of termination, notwithstanding any provisions of this agreement to the contrary, all of the rights, privileges, obligations and licenses of the parties hereto, shall cease and terminate and both parties thereafter shall be released from the terms, provisions and obligations imposed upon them hereunder; ... provided, however, [Champion] during the period

of twelve months thereafter, shall have the right, privilege and license to enter, cut and remove or utilize any timber backlog existing at the time of such termination."

**11.** Paragraph 4A of the TPA sets out the method of payment as follows:

"[Champion] shall pay to [Appellants], on the first day of October, 1958, and thereafter on the first day of January, April, July and October of each year during the term hereof, one-fourth of the purchase price of 1500 cords of

addition to pine timber, Champion also had the right to cut and remove hardwoods. Champion had the option of paying for the hardwoods after they were cut; applying the cut hardwood against the annual authorized cut of pine timber; or, of reducing the backlog of pine timber on a cord for cord basis for each cord of hardwood cut.[12] Since payment for hardwood timber was called for only after the fact, in the month *following* the month in which it was cut, logically, there could be no hardwood timber which was paid for before it had been cut. The only timber which was paid for in advance, and therefore, the only timber which could be "paid for but not cut", was pine pulpwood. We hold that the timber backlog consisted only of pine timber and not hardwood, and that Champion did not have the right to cut and remove hardwood as part of the timber backlog after the TPA was terminated.

## CONCLUSION

For all of the forgoing reasons, we REVERSE the order of the district court granting summary judgment in favor of Champion, and we REMAND with directions to enter summary judgment in favor of the plaintiffs-appellants.

pine pulpwood; ... The quarter-annual payments required to be made hereunder shall be based upon a purchase price of $4.00 per cord of pine pulpwood until a different price per cord of pulpwood is fixed.... Seller shall be paid for hardwood (as herein defined) on the 10th day of the month succeeding the month in which such pulpwood is cut."

12. Paragraph 4D provides that:
"[Champion], in addition, may cut, remove and utilize pulping hardwood timber on the land in any quantities [Champion] may desire, paying therefor at the rate provided in Paragraph 2 hereof on the 15th day of the month succeeding that in which said hardwood is cut, or, [Champion] may apply the same against the annual authorized cut of pine timber on a cord for cord basis; or, if a backlog of pine timber exists, [Champion] may reduce the backlog by cutting pulping hardwood and such backlog shall be reduced by one cord of pine pulpwood for each cord of pulping hardwood cut and removed by [Champion]."