DECISION AND JUDGMENT ENTRY *Page 2 
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, which granted summary judgment to appellees, Joseph Carlton, M. Paul Turner, M. Paul Turner Co., Incentive Research Corporation of Florida ("IRC of Florida"), Incentive Research Corporation of Ohio, Inc. ("IRC of Ohio"), Marshall Melhorn, L.L.C. ("Marshall Melhorn"), National Life Insurance Company ("National Life"), Bennett H. Speyer, Linda Velandra, and Velandra, Zbierajewski Nowicki, L.L.C, and dismissed a complaint filed by appellant, Karen Driftmyer, as Administratrix of the Estate of her deceased brother, Gary Driftmyer. On appeal, appellant sets forth the following six assignments of error:
 {¶ 2} "1. The trial court erred in finding that National Life Insurance Company owned plaintiff/appellant's decedent no fiduciary or other duty when genuine issues of material fact were in dispute as to [the] existence of said duty.
 {¶ 3} "2. The trial court erred in finding that Joseph Carlton owed plaintiff/appellant's decedent no fiduciary of other duty when genuine issues of material fact were in dispute as to [the] existence of said duty.
 {¶ 4} "3. The trial court erred in finding that Bennett Speyer and Marshall Melhorn, LLC owed plaintiff/appellant's decedent no fiduciary or other duty when genuine issues of material fact were in dispute as to [the] existence of said duty.
 {¶ 5} "4. The trial court erred in finding that defendant/appellees M. Paul Turner and M. Paul Turner and Company owed plaintiff/appellant's decedent no fiduciary or *Page 3 
other duty when genuine issues of material fact were in dispute as to [the] existence of said duty.
 {¶ 6} "5. The trial court erred in finding that Velandra defendants/appellees owed plaintiff/appellant's decedent no fiduciary or other duty when genuine issues of material fact were in dispute as to [the] existence of said duty.
 {¶ 7} "6. The trial court erred in finding that the J.D.R.M. Engineering, Inc. Fully Insured Defined Pension Benefit Trust [sic] was the qualified pension or profit sharing trust described in section D of Gary Driftmyer's life insurance policy application and the beneficiary of Gary Driftmyer's life insurance policy proceeds."
 {¶ 8} The undisputed facts that are relevant to the issues raised on appeal are as follows. J.D.R.M. Engineering, Incorporated ("JDRM"), is an Ohio corporation that was formed in 1995 by Lawrence Juette, Daniel Rosenberger, Steven Morris, and Gary Driftmyer (referred to collectively as "the partners"). In the years following its formation, JDRM became a successful and profitable company, and the partners began looking for ways to shelter portions of their income from taxes. JDRM's certified public accountant, Mike Zbierajewski, introduced the partners to Joe Carlton, an insurance agent for National Life, who agreed to perform a feasibility study to determine what type of pension plan would best serve the partners' needs, based on their individual incomes. After performing the study, Carlton proposed setting up a fully insured defined benefit pension plan, funded with annuities and life insurance policies. The partners agreed to *Page 4 
proceed and, in December 1998, the J.D.R.M. Engineering, Inc. Fully-Insured Defined Benefit Pension Plan Trust ("the Plan") was created.
 {¶ 9} The Plan consisted of two parts: a pension plan and an associated trust, funded by annuities and life insurance policies on each of the partners, which were sold by Carlton and issued by National Life. It contained numerous provisions for the acquisition of assets and distribution of benefits. Particularly relevant to this appeal were the provisions for payment of benefits upon the death of one of the partners.
 {¶ 10} Pursuant to Article IV, Section 4.10 of the Plan, all life insurance policies purchased on the lives of the four partners were to be owned by a "Special Trustee." Upon the death of a partner, the Special Trustee was directed to collect all the proceeds of life insurance and annuities on that partner's life and pay those proceeds, in his or her discretion, to one or more of the following beneficiaries: 1) the deceased partner's spouse; 2) any trust under which the deceased partner was the grantor; or 3) the deceased partner's estate.
 {¶ 11} On May 22, 2003, Gary Driftmyer died from injuries he received in an automobile accident. At the time of his death, Gary Driftmyer was 57 years old. He had no spouse or children. Linda Velandra, the Special Trustee designated on Driftmyer's life insurance application, received the proceeds from his life insurance and annuities on behalf of the Plan. Pursuant to Article IV, Section 4.10, Velandra paid the life insurance and annuity proceeds, which were in excess of $2 million, to Driftmyer's intestate estate. Gary Driftmyer's sister, Karen Driftmyer, was eventually determined to be the sole heir. *Page 5 
 {¶ 12} The estate's federal and state tax burden, probate charges, court costs, and attorney fees exceeded $1 million. On May 21, 2004, Karen Driftmyer, acting as administrator of her deceased brother's estate, filed a complaint in the Lucas County Court of Common Pleas against appellees, in which she sought damages due to breach of fiduciary duty and negligence on the part of Carlton, Turner, Speyer, and Velandra, for failing to properly advise Gary Driftmyer to set up a separate trust, and/or ensure that Gary Driftmyer named a proper beneficiary to whom his life insurance proceeds could be paid, thereby causing his estate to pay excessive fees and taxes. In addition, the complaint claimed liability on the part of National Life for not requiring the establishment of a trust, and for allowing Carlton to sell its life insurance products. Finally, the complaint claimed liability due to agency and/or respondeat superior on the part of Turner's company, M. Paul Turner Co.; Carlton's employer, IRC of Florida; Zbierajewski's company, IRC of Ohio; Bennett Speyer's then-employer, Marshall Melhorn, and Velandra's accounting firm, Velandra, Zbierajewski Nowicki, L.L.C.
 {¶ 13} Appellees responded by filing separate motions for summary judgment. In their respective motions, Carlton, Speyer, Velandra, and Turner asserted that no fiduciary duty existed between themselves and Gary Driftmyer. In addition, Carlton and Speyer claimed that they both advised Gary Driftmyer to create a separate trust to receive the annuity and life insurance proceeds. National Life, M. Paul Turner Co., Marshall Melhorn, IRC of Florida, IRC of Ohio, and Velandra, Zbierajewski Nowicki, L.L.C, all responded that: 1) they had no vicarious liability to the estate; and 2) no duty was *Page 6 
breached because the estate suffered no damages. In addition, appellees collectively asserted that J.D.R.M. Engineering, Inc. Fully-Insured Defined Benefit Pensions Plan Trust was the proper beneficiary of Gary Driftmyer's life insurance policy. Karen Driftmyer opposed each of appellees' motions for summary judgment.
 {¶ 14} In support of their respective motions, all parties relied on numerous exhibits, including copies of the Plan document, Gary Driftmyer's application for life insurance from National Life, a loan application submitted to Keybank by Gary Driftmyer, and correspondence between Speyer and the JDRM partners concerning the nature of Speyer's role in JDRM's corporate restructuring and the subsequent formation of the Plan. In addition, the parties relied on the deposition testimony of Juette, Rosenberger, Morris, Speyer, and Carlton, all of whom testified on behalf of appellees, and Karen Driftmyer, attorney Thomas Bergh, Mark Mockensturm, CPA, attorney C. Terry Johnson, and Michael Smith, Ph.D., who testified on behalf of Karen Driftmyer.
 {¶ 15} In his deposition, Juette testified that the primary purpose of the Plan was to "shelter present income into a retirement plan". He stated the Plan would expire after ten years, and was to be funded with an equal amount of annuities and life insurance. Juette further stated the Plan was prepared by Carlton, who was introduced to the partners by JDRM's then-accountant, Zbierajewski.
 {¶ 16} Juette testified that Gary Driftmyer did not think life insurance should be a part of the Plan, because "he [Driftmyer] didn't have anybody to leave it to." Juette further testified that "nobody wanted the life insurance portion and you have to pay a *Page 7 
large portion up front into life insurance"; however, they all agreed to participate in the Plan because of the retirement benefits and the ability to shelter present income from taxes. Juette stated that no one told him to set up a separate trust as part of the Plan; however, he had a personal trust in existence before the Plan was enacted. Juette further stated he was aware the life insurance proceeds would be taxed if they were given directly to his children upon his death, and he was "relying on others" to make sure any proceeds were distributed according to his wishes.
 {¶ 17} Rosenberger testified in his deposition that he first heard about the Plan at a seminar, where he listened to Carlton pitch "a plan that met the tax codes that would allow [the partners] to put additional monies away in a retirement type investment portfolio of some kind." Rosenberger stated that, at some point, the partners were asked to sign a confidentiality agreement,[1] and to give Carlton information concerning their individual incomes. Rosenberger testified that the Plan was funded by equal amounts of annuities and life insurance, both of which were purchased by JDRM; however, the premiums were reported as W-2 income to each of the partners.
 {¶ 18} Rosenberger testified that, in December 1998, when the Plan documents were executed, Carlton and Speyer both recommended the partners set up a "will or trust or something" to receive the annuities and life insurance proceeds, and to act as a tax shelter to preserve assets for their families. Rosenberger understood that establishing a *Page 8 
separate trust was not part of the Plan but, nevertheless, he and his wife set up a separate trust in January 1999 with the help of Speyer's associate, attorney Tom Christensen. Rosenberger chose Christensen because Christensen was "already inside" the confidentiality agreement. Rosenberger stated his own trust was created "to take full advantage of the tax benefits that the plan was there to generate. Rosenberger further stated that "Gary had a rather cavalier approach, he did not want the insurance even initially [because he had] no one to leave it to." Rosenberger's suggestion that Gary Driftmyer could set up a trust to leave his money to charity was disregarded. Rosenberger testified that Gary Driftmyer was a "very stubborn individual. If he didn't agree with [an idea], it pretty much stopped there."
 {¶ 19} Morris testified in his deposition that he originally met Carlton at the same seminar attended by Rosenberger. Morris stated that he understood the purpose of the Plan was to shelter earned income for ten years, and then "decide what to do with it." Morris further stated that, three years after the Plan became effective, he hired JDRM's corporate attorney, Chris Steiner, to create a separate trust for himself, and that creating a separate trust was Morris's own idea.
 {¶ 20} Morris testified that he did not know who the "trustee" was under the Plan, or who actually owned his life insurance policy. He did not remember any of the partners being opposed to the Plan; however, he stated that Gary Driftmyer "was not a fan of the life insurance portion * * * [because] he was single and therefore the beneficiary issue was not an issue to him." Morris stated that Gary Driftmyer was detail oriented as a *Page 9 
professional, but insisted on doing things "his way." Morris further testified that he and his wife met with Carlton in 1998, but they did not discuss personal estate planning or tax consequences of the life insurance at that meeting. Morris understood that, eventually, money in the Plan would be taxed; however, he hoped that by deferring the tax liability as long as possible, he and/or his heirs would be in a lower tax bracket.
 {¶ 21} Speyer testified in his deposition that, as legal counsel for JDRM, it was his job to make sure the Plan was "valid under * * * legal and tax rules." Speyer further testified that the Plan's goal was to reward key employees and find a "way to accumulate benefits for retirement and at the same time reduce their [the partners'] income taxes through tax deductible contributions to a plan." Speyer stated the Plan was funded through life insurance and annuity contracts, thereby avoiding the minimum funding requirements for pension plans under ERISA and the IRS code. Speyer explained that, because life insurance policies carry lower interest rates, a higher contribution is allowed into the Plan, allowing the partners to shelter more income, and "accelerating the funding of the benefits."
 {¶ 22} Speyer testified that, pursuant to the terms of the Plan, a Special Trustee was designated to receive the annuity and life insurance proceeds upon the death of a partner. The Special Trustee then had discretion to pay the proceeds to one or more of three categories of beneficiary: 1) the deceased partner's estate; 2) his spouse; or 3) a separate trust established by the deceased partner. Speyer stated that Carlton explained the workings of the Plan to the partners, and Speyer explained the "merits" of the Plan. *Page 10 
Speyer further stated that he "wanted to make sure that the partners understood that there was no guarantee that those proceeds would be excluded [from taxation]" because the IRS had not yet issued a ruling on the tax-exempt status of such plans. He explained that the basis of tax-exempt status, if any, was that the policies were not owned by the partners, so any proceeds initially would be outside that partner's probate estate. Speyer further stated that, if the proceeds were paid to a spouse, due to the unlimited marital deduction, they would not be taxed until her death. He stated that, alternatively, if the special trustee paid life insurance proceeds to a partner's separate trust, there could be the "added benefit of exempting these proceeds from estate tax * * *."
 {¶ 23} Speyer stated that, before the Plan was adopted, he met with each of the partners for 15 to 20 minutes, during which time he advised them to set up a separate trust outside the Plan, to maximize tax savings. Speyer further stated that Gary Driftmyer was "somewhat flippant" about the issue, which Speyer considered to be an "unusual attitude." Speyer testified that Gary Driftmyer told him "whatever [my heirs] get is more than they could ever imagine or reasonably or rightfully expect * * *." Speyer further testified that it was Gary Driftmyer's responsibility to set up a separate trust, and that Rosenberger set up a separate trust after hearing the same advice from Speyer and Carlton.
 {¶ 24} Speyer testified that under the Plan Velandra, as the Special Trustee designated in Gary Driftmyer's life insurance application, became the policy's custodian and legal owner. However, the Plan limited Velandra to distributing the proceeds to Gary *Page 11 
Driftmyer's estate, spouse, and/or special trust. Gary Driftmyer retained no indicia of ownership over the policy, since he could not remove or replace the Special Trustee and he did not own the policy. In addition, Speyer stated that Velandra did not have authority to set up a separate trust outside the Plan to receive the proceeds.
 {¶ 25} Speyer stated the goal of the Plan was to reduce income taxes, and he was not hired by JDRM to advise the partners as to estate planning. He did not know if Velandra was the Special Trustee for all the partners' life insurance policies; however, he believed she signed all the life insurance applications. He did not remember meeting with Gary Driftmyer privately, except to explain the benefits of having a separate trust. Speyer testified that, as corporate attorney for JDRM, he did not have a legal duty to the partners as individuals.
 {¶ 26} Carlton testified in his deposition that he met with each of the partners individually, and that Juette, Rosenberger and Morris brought their wives to those meetings. Carlton further testified that the "big drawback" of the Plan is that "all of that money at a man's death is subject to IRD — that's income in respect of a decedent, and it is a horror story beyond belief." Carlton stated he explained to the partners that money in the pension plan is subject to tax; however, they could "try to plan around it." Carlton further stated that, if an insured does not retain indicia of ownership, the proceeds of the life insurance policies potentially are not subject to taxation. Carlson said he explained the need for a separate trust to Gary Driftmyer; however, Driftmyer "didn't seem interested." Carlton echoed Speyer's testimony by recounting Driftmyer's statement that *Page 12 
"my heirs are going to get a lot more money out of this than * * * probably they would expect * * *."
 {¶ 27} Carlton testified that he was not asked to create any trusts for the partners outside the Plan. Carlton further testified that he initially analyzed JDRM's need for a tax shelter by evaluating information provided by the partners. He then presented an outline of the Plan through a PowerPoint presentation, which showed how contributions would go into the plan and how life insurance proceeds would eventually go out, on death, to a separate outside trust. Carlton stated that, without a separate trust, "there's going to be a lot of money lost."
 {¶ 28} Carlton stated that the primary purpose of the Plan was to save taxes on the partners' earned income, and to provide money for retirement. He further stated that "the plan was installed properly. The second part of what you have to do was not. The trust evidently wasn't done by Gary." As to Turner's alleged liability, Carlton also testified that, as actuary for the Plan, Turner's only job was to make sure the plan has appropriate funding and fill out the tax forms. He stated that IR of Ohio was involved in formation of the Plan, but was not affiliated with Turner's company, IR of Florida.
 {¶ 29} Bergh testified that federal income taxes on Gary Driftmyer's life insurance proceeds "would not have been materially different regardless of how the transaction was structured." However, in order to obtain maximum advantages from the Plan, it was necessary for the "individuals or entities which had marketed and sold the product to Mr. Driftmyer [to] advise him" on ways to maximize the Plan's tax advantages. Bergh *Page 13 
assumed that, based on the tax consequences in this case, Gary Driftmyer was not so informed; however, he did not know exactly how the Plan was "pitched" to the partners, and he admitted that Gary Driftmyer may have chosen to ignore his advisors' advice. Bergh acknowledged that the record contained evidence that Speyer recommended forming a separate trust. Bergh further stated that, after reviewing the Plan documents, he did not believe the "subtrust idea" was advisable.
 {¶ 30} Bergh testified that the life insurance component of the Plan was "basically a funding vehicle" provided by National Life, which was not a fiduciary of the Plan. Bergh said he had no criticism of Turner, since he did not know if Turner actually promoted the Plan or "just crunched numbers." Similarly, Bergh stated he is not an accountant; therefore, he had no opinion as to the standard of care to be applied to Velandra. He stated that no one could be found negligent if Gary Driftmyer was advised to set up a separate trust and refused to do so. Bergh further stated that, if a separate trust had been established, the estate would not have gotten any of the life insurance proceeds. He could not determine who would have benefited from such a trust if it had been established. Bergh also stated that, even though it was not properly executed, the Plan provided some tax benefits to Gary Driftmyer, by allowing him to shelter up to $48,000 of his taxable income each year by diverting it into the Plan.
 {¶ 31} Johnson testified in his deposition that the Plan "apparently was set up fine;" however, he did not believe Speyer told Gary Driftmyer to set up a separate trust to avoid taxes. Johnson further concluded that Velandra was appointed Special Trustee of a *Page 14 
trust that did not exist because, if there was such a trust, it would have been the beneficiary of the life insurance policy. He stated that the identity of the separate trust beneficiary is, at best, "speculative."
 {¶ 32} Johnson had no criticism of Turner as actuary of the Plan, since "[Turner's] role was solely to make certain annual computations and he did it and God bless him." Johnson testified that Velandra, an accountant, was unqualified to draft the separate trust. He further testified that, even if a separate trust had existed, Velandra, as Special Trustee under the Plan, had unlimited discretion to pay the life insurance proceeds to either the separate trust or Gary Driftmyer's estate. He also stated that it is possible that Gary Driftmyer was advised to set up a separate trust and chose to ignore that advice.
 {¶ 33} Smith, a self-proclaimed risk management expert, testified in his deposition that he has never written a trust document or a pension plan, and he has never executed his own will. Nevertheless, Smith testified, after reviewing documents given to him by Karen Driftmyer's counsel, that "the special trust for which Linda Velandra served as special trustee never was * * * formed." Smith further testified that National Life should have been concerned about setting up a separate trust because of the size of Gary Driftmyer's life insurance policy. Smith stated that he did not read the entire Plan document; however, he concluded that the JDRM Engineering, Inc. Fully-Insured Defined Benefit Pension Trust listed on Gary Driftmyer's life insurance application never existed. Smith further stated that the parties clearly intended to form a "special" separate *Page 15 
trust; however, "Linda Velandra failed to alert Gary Driftmyer to the fact that this special trust hadn't been established."
 {¶ 34} Smith testified that the purpose of the Plan was to reduce income taxes and set aside retirement money for the partners; however, he was not sure if "overall taxes" were actually saved in this case. Smith stated that, generally, whole-life insurance policies are a "high-cost, low-return kind of investment," because their tax-favored status is already calculated into the interest rate paid on the principal portion of the investment, and the designation of a pension trust as both owner and beneficiary of a life insurance policy is "a mistake." In addition, Smith concluded that Carlton's failure to set up an "appropriate trust mechanism" to achieve the Plan's objective amounted to negligence.
 {¶ 35} Mockensturm testified in his deposition that, as an attorney and a certified public accountant, he has performed "simple estate planning" and prepared estate and income tax forms; however, he never performed "tax avoidance" services for clients, and had never before testified as a tax expert. Mockensturm offered no opinion as to any of the defendants' liability for professional negligence, since he was not involved in "establishing this lawsuit." Mockensturm stated he had not reviewed the National Life policy or the Plan documents. Nevertheless, he opined that an "owner" as set forth in the Plan, is "someone who was named as a trustee, a sub-trustee * * * But apparently there was no trust ever established." Mockensturm stated that the Plan was designed to give a benefit to the partners through a pension plan. Its primary feature was to allow Gary Driftmyer to name a beneficiary of a life insurance policy that is not owned by his estate. *Page 16 
Mockensturm stated that he did not know whether Gary Driftmyer had executed a will, and he relied on information supplied by Karen Driftmyer's legal counsel to support his conclusion that Karen Driftmyer would have been the beneficiary of the trust, if it had existed.
 {¶ 36} Karen Driftmyer testified in her deposition that Gary Driftmyer never talked to anyone about his investments or assets. She stated that, after her brother died, someone told her she was the beneficiary of his $2 million life insurance policy. She stated Gary Driftmyer had life insurance policies outside the Plan, all with named beneficiaries. Karen Driftmyer stated that "[everybody involved in setting this up had a duty to make sure that it was done properly." She concluded that the estate owed $1 million in taxes because "somebody forgot to do something," and that Velandra was the "sub-trustee" of something that did not exist.
 {¶ 37} Karen further testified that she became the sole beneficiary of her brother's estate after her mother, the primary heir, disclaimed any interest in it. She said that, after taxes, the estate amounted to approximately $1.8 million. She also stated that, in spite of the size of his estate, Gary Driftmyer died without having a trust, will, health-care power of attorney, or general power of attorney.
 {¶ 38} On January 18, 2006, the trial court filed a judgment entry in which it found, after reviewing the Plan documents and deposition testimony, that "a trust was in existence at the time the life insurance policy was executed and that trust was the named beneficiary of Mr. Driftmyer's life insurance policy." The trial court further found that *Page 17 
Gary Driftmyer was adequately informed by Speyer and Carlton as to the need for a separate trust, and none of the defendants can be charged with the continuing duty to make sure he followed that advice. Accordingly, the trial court granted summary judgment to the defendants as a matter of law, and dismissed Karen Driftmyer's complaint. A timely notice of appeal was filed on January 26, 2007.
 {¶ 39} We note at the outset that an appellate court reviews a trial court's granting of summary judgment de novo, applying the same standard used by the trial court. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129; Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 {¶ 40} Initially, the party seeking summary judgment bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the non-moving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. In so doing, "the moving party must be able to specifically point to some evidence, of the type listed in Civ.R. 56(C), which affirmatively demonstrates that the nonmoving party has no evidence to support [that party's] claims." Id. Once the moving party satisfies this initial burden, the nonmoving party then has a reciprocal burden, as outlined in Civ.R. 56(E), to set forth specific facts showing that there remains a genuine issue for trial. Id. *Page 18 
 {¶ 41} In her sixth assignment of error, appellant asserts that the trial court erred when it found "a trust was in existence at the time the life insurance policy was executed and that trust was the named beneficiary of Mr. Driftmyer's life insurance policy." In support, appellant argues that the "Qualified Pension or Profit Sharing Trust" designated as the "Beneficiary" in section E of Gary Driftmyer's life insurance application is the same as the trust to be funded by the Special Trustee pursuant to Article IV, Section 4.10(a). Appellant concludes that, since Gary Driftmyer never established a separate trust to receive his life insurance proceeds, the beneficiary of his life insurance policy did not actually exist and the Special Trustee, Velandra, had nothing to oversee.
 {¶ 42} Generally, the interpretation of terms of a written contract is a matter of law. Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, paragraph one of the syllabus. The primary objective in making such a determination is to ascertain the intent of the parties.Ohio Water Dev. Auth. v. Western Res. Water Dist, 149 Ohio App.3d 155,2002-Ohio-4393, ¶ 25, citing Aultman Hosp. Assn. v. Community Mut. Ins.Co. (1989), 46 Ohio St.3d 51, 53. In addition, it is well-settled that the parties' conflicting interpretations of contract language, without more, is insufficient to create an unreasonable interpretation of the contract's terms. Id., citing Steward v. Champion Internatl. Corp.
(C.A.11, 1993), 987 F.2d 732, 734. See, also, Aerel, S.R.L. v. PCCAirfoils, L.L.C (C.A.6, 2006), 448 F.3d 899, 904. Accordingly, courts must give the agreement "a just and reasonable construction that carries out the intent of the parties as *Page 19 
evidence by the contractual language." Id., citing Skivolocki v. E. OhioGas Co. (1974), 38 Ohio St.2d 244, at paragraph one of the syllabus.
 {¶ 43} In this case, it is undisputed that each of JDRM's four founding partners was listed as the "Proposed Insured" under his own, separate, life insurance policy. Section E of Gary Driftmyer's life insurance application names the "Qualified Pension or Profit Sharing Trust described in section D" as the beneficiary of that policy. Section D of the policy application describes the "Qualified Pension or Profit Sharing Trust" referenced in section E as "J.D.R.M. Engineering, Inc., Fully Insured Defined Benefit Pension Trust." In addition, Article I, Section 1.57 of the Plan document defines the term "Trust" as "J.D.R.M. Engineering, Inc. Fully-Insured Defined Benefit Pension Plan Trust."
 {¶ 44} Article I, Section 1.58 of the Plan document names "Larry T. Juette, Gary W. Driftmyer, Daniel V. Rosenberger and Steve D. Morris and their duly appointed successors" as the "Trustees" of the Plan. However, Article IV, Section 4.10 of the Plan document states that, "[notwithstanding any other provision of this Plan or its related Trust," all life insurance policies purchased on the life of Juette, Driftmyer, Rosenberger, or Morris "shall be owned by the Special Trustee." A further review of the record shows that Linda Velandra signed Gary Driftmyer's life insurance application as the policy's "Applicant," in her capacity as "Special Trustee for the Irrevocable Trust for J.D.R.M. Engineering Inc., Fully Insured Defined Benefit Pension Trust." Her designation as "Special Trustee" of the Plan is consistent with both Article IV, Section 4.10 of the Plan *Page 20 
document and Section M(2) of Gary Driftmyer's life insurance application which states that, if the policy's "Applicant" is "a Business Entity or Pension or Profit Sharing Trust," the application is to include the "full legal name and title" of that entity.
 {¶ 45} Article IV, Section 4.10(a) of the Plan document provides that, upon the death of one of the partners, the Special Trustee has discretion to distribute that partner's life insurance and annuity proceeds to any one or more the following: the deceased partner's spouse,[2] any trust under which the deceased partner is the grantor, or the deceased partner's estate. In addition, Article IV, Section 4.10(a) states that, "[t]he decision of the Special Trustee shall be final and binding upon all parties interested in the Policy proceeds, and the Special Trustee shall have no liability to anyone as a result of his decision in this regard."
 {¶ 46} After reviewing the above portions of the Plan document and Gary Driftmyer's life insurance application, we find that the only reasonable interpretation of the language employed therein is that the name "JDRM Engineering, Inc., Fully Insured Defined Benefit Pension Trust" refers to the trust that was set up as part of the Plan. Similarly, the only reasonable interpretation of Velandra's role is that she was designated as the "Special Trustee" for Gary Driftmyer under the trust portion of the Plan, with the specific duty of receiving life insurance and annuity proceeds and distributing them to *Page 21 
one or more of a defined class of beneficiaries in the event of his death. Appellant's sixth assignment of error is not well-taken.
 {¶ 47} We will next address appellant's second assignment of error, in which she asserts that the trial court erroneously found that Carlton did not breach any duty owed to Gary Driftmyer. In support, appellant argues that issues of fact remain as to whether Carlton breached a duty to: 1) insure that a "proper existing beneficiary" was listed on Gary Driftmyer's life insurance application; 2) advise Gary Driftmyer of the need for a separate trust; and 3) take additional steps to make certain that a separate trust was actually established.
 {¶ 48} In support of her first argument, appellant argues that Carlton was negligent for not ensuring that "JDRM Engineering, Inc. Fully-Insured Defined Pension Benefit Trust" was properly created and named as beneficiary of Gary Driftmyer's $2 million life insurance policy. However, in our determination of appellant's sixth assignment of error, we found that the only reasonable interpretation of the Plan language employed is that the name "JDRM Engineering, Inc., Fully Insured Defined Benefit Pension Trust" refers to the Plan itself. Accordingly, a trust was in existence to initially receive the life insurance proceeds. Appellant's first argument is without merit.
 {¶ 49} Appellant next argues that, by virtue of his role in designing the Plan and choosing life insurance policies and annuities as its funding mechanism, Carlton owed a fiduciary duty to JDRM and Gary Driftmyer which extended to ensuring that an outside trust was created to receive each of the partners' life insurance proceeds. Appellant *Page 22 
concludes that Carlton breached this fiduciary duty by failing to ensure that Gary Driftmyer set up a "proper" trust to receive the life insurance proceeds, thereby causing the estate to pay taxes it otherwise would not have had to pay.
 {¶ 50} Generally, in order to maintain actionable negligence, "the plaintiff must show (1) the existence of a duty, (2) a breach of that duty, and (3) an injury proximately resulting from the breach."Robinson v. Bates, 112 Ohio St.3d 17, 2006-Ohio-6362, ¶ 21, citingMenifee v. Ohio Welding Prods., Inc. (1984), 15 Ohio St.3d 75, 77. The existence of duty is normally a question of law to be initially determined by the court. Nageotte v. Cafaro Co., 160 Ohio App.3d 702,2005-Ohio-2098, ¶ 37 (citations omitted). It is fundamental in establishing a negligence claim. Miller v. Keybank Natl. Assn., 8th Dist. No. 86327, 2006-Ohio-1725, ¶ 26.
 {¶ 51} The elements of an action for breach of fiduciary duty are similar to those for ordinary negligence, with the difference being a need to establish that the duty arose out of a fiduciary relationship. A fiduciary relationship is defined as one in which "`special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" Carnahan v. Sci Ohio Funeral Svcs, Inc. (Mar. 13, 2001), 10th Dist. No. 00AP-490, quoting Ed Schory Sons, Inc. v.Soc. Natl. Bank (1996), 75 Ohio St.3d 433, 442 (other citation omitted).
 {¶ 52} Normally, the existence of a fiduciary relationship depends on the facts and circumstances presented in each case. Hoyt v. NationwideMut. Ins. Co., 10th Dist. No. *Page 23 
04AP-941, 2005-Ohio-6367, ¶ 30. In this case, to show the existence of a fiduciary relationship between Carlton and Gary Driftmyer, appellant relies on Carlton's testimony that he gathered information from the partners before recommending the Plan, and he advised each of the partners as to how the Plan would save taxes. In support, appellant cites Smith's, Johnson's, and Bergh's testimony that the partners were prohibited by a "confidentiality agreement" from seeking outside advice, thereby forcing them to rely on Carlton and the other appellees in executing the Plan. She also asserts that the trial court's reliance on Speyer's Rosenberger's and Carlton's testimony that they advised Driftmyer and the other partners to establish separate, outside trusts was misplaced, because Juette and Morris did not remember receiving such advice. In addition, appellant relies on her own testimony that her brother intended for her to receive the maximum benefit from his estate, because they were "close," and she was listed as the "beneficiary" of his life insurance policy on a Keybank loan application.
 {¶ 53} Each of these arguments is flawed. First, as set forth above, the record does not contain a copy of the "confidentiality agreement." Accordingly, even if such an agreement exists, we cannot consider it in determining the outcome of this appeal. Caravella v. West-WHI ColumbusNorthwest Partners, 10th Dist. No. 05AP-499, 2005-Ohio-6762, ¶ 25. Second, Juette's and Morris's failure to remember whether Carlton advised them to set up a separate trust is not dispositive of whether or not such advice was ever given. Third, Gary Driftmyer's naming of appellant as "beneficiary" on a loan application is, at best, evidence that he knew his sister would somehow receive life *Page 24 
insurance proceeds upon his death. However, even if such evidence were sufficient to raise an issue of fact as to whether Carlton breached a fiduciary owed duty to Gary Driftmyer, it would be irrelevant to our determination of this appeal, for the following reasons.
 {¶ 54} It is axiomatic that in cases "`[w]here there is no obligation of care or caution, there can be no actionable negligence.'"Miller, supra, ¶ 26, quoting 70 Ohio Jurisprudence 3d (1986), 53-54, Negligence, Section 13. Ultimately, the issue of whether any duty, fiduciary or otherwise, exists depends upon whether the claimed injury to the plaintiff was foreseeable; i.e., whether a reasonably prudent person could have anticipated that a particular injury was likely to result from his or her performance or nonperformance. Gerace-Flick v.Westfield National Ins. Co., 7th Dist. No. 01 CO 45, 2002-Ohio-5222, ¶ 26, citing Menifee v. Ohio Welding Prod. (1984), 15 Ohio St.3d 75, 77.
 {¶ 55} It is undisputed that more than $1 million in taxes, attorney fees and court costs were paid due to the inclusion of $2 million in life insurance and annuity proceeds in Gary Driftmyer's estate.[3]
However, if a separate trust had been established to receive the life insurance proceeds, as appellant insists should have happened in this case, none of those assets would have been included in Driftmyer's probate estate. See In re Gatch's Estate (1950), 153 Ohio St. 401, 403
("The beneficiary of a life insurance policy is not a *Page 25 
distributee under a will or of an intestate estate. Citation of cases seems unnecessary." Id.). In addition, several witnesses speculated that creation of a separate trust would reduce or eliminate taxes. However, appellant presented no evidence as to how such a trust should have been structured. Finally, pursuant to the terms of the Plan, even if a separate trust had been established, the Special Trustee had absolute discretion to pay the proceeds of Driftmyer's life insurance policy either to that trust or to his estate.
 {¶ 56} This court has reviewed the entire record that was before the trial court and, upon consideration thereof, finds that the record contains no evidence of foreseeable harm to Gary Driftmyer's estate, based on either the naming of the "JDRM Engineering, Inc. Fully-Insured Defined Pension Benefit Trust" as the beneficiary of Driftmyer's life insurance policy, or Driftmyer's failure to establish a separate trust to receive his life insurance proceeds from the Special Trustee pursuant to Article IV, Section 4.10(a). Without a showing of such harm, appellant cannot demonstrate that a genuine issue remains as to whether Carlton owed a fiduciary duty to ensure that a separate trust was created by Gary Driftmyer. Miller, supra. Appellant's second assignment of error is, therefore, not well-taken.
 {¶ 57} In her first assignment of error, appellant argues that National Life is liable for its own negligence in failing to ensure that the trust designated initially to receive the proceeds of Gary Driftmyer's life insurance policy actually existed. Alternatively, appellant argues that Nation Life is liable either pursuant to "an agency relationship or under respondeat superior doctrine theory," for any breach of duty on the part of Carlton. *Page 26 
 {¶ 58} Appellant's first argument is without merit, since we have already determined that a trust was created within the Plan to initially accept Gary Driftmyer's life insurance proceeds. As to appellant's second argument, we recognize that, generally, an employer can be held vicariously liable for the acts of his agents or employees. Albain v.Flower Hosp. (1990), 50 Ohio St.3d 251, 255, overruled on other grounds by Clark v. Southview Hosp. Family Ctr. (1994), 68 Ohio St.3d 435. However, as set forth in our determination of appellant's second assignment of error, Carlton owed no duty to Gary Driftmyer in relation to the creation of a separate trust.
 {¶ 59} On consideration of the foregoing, appellant's claims of direct and/or vicarious liability on the part of National Life have no merit. Appellant's first assignment of error is not well-taken.
 {¶ 60} In her third assignment of error, appellant asserts that the trial court erred by finding that Speyer and Marshall Mellhorn did not breach a duty to Gary Driftmyer. In support, appellant argues that a genuine issue of fact remains as to: 1) whether Speyer took steps to ensure the creation of an "Irrevocable Trust for the J.D.R.M. Engineering, Inc., Fully Insured Defined Pension Benefit Plan" to initially receive the life insurance proceeds; 2) whether Speyer properly advised Gary Driftmyer of the necessity to establish a separate trust to avoid estate taxation on the life insurance proceeds upon his death and then made certain such a trust was created; and 3) whether Speyer's then-employer, Marshall Mellhorn, should have been found vicariously liable for his negligent acts. *Page 27 
 {¶ 61} We previously determined that a trust was created within the Plan to initially accept Gary Driftmyer's life insurance proceeds. Accordingly, appellant's first argument has no merit.
 {¶ 62} In support of her second argument appellant claims that, by virtue of the attorney-client relationship between Speyer and the partners, Speyer had a duty to ensure that a separate trust was created to receive the proceeds of Gary Driftmyer's life insurance policy, or least inform Driftmyer of the need to set up such a trust. In other words, appellant is alleging that Speyer is liable to Driftmyer's estate for legal malpractice.
 {¶ 63} Ohio courts have held that, in order to establish a cause of action for legal malpractice, the plaintiff must show the existence of an attorney-client relationship that creates a duty or obligation to the plaintiff,[4] and a breach of that duty or obligation which is the proximate cause of plaintiff s damages. Lutz v. Balch, 10th Dist. No. 06AP-247, 2006-Ohio-4630, ¶ 7; Vahila v. Hall (1997), 77 Ohio St.3d 421, at the syllabus. As with the existence of a fiduciary relationship, the scope and duration of an attorney-client relationship is generally a question of fact. Cook v. Caruso, 6th Dist. No. L-05-1208,2006-Ohio-1982, ¶ 27, S citing Omni-Food Fashion, Inc. v. Smith (1988),38 Ohio St.3d 385, 388. However, the existence of a legal duty arising out of that relationship is a matter of law to be decided by the court.Nageotte v. Cafaro Co., supra. *Page 28 
 {¶ 64} On appeal, appellant relies on a commitment letter dated September 11, 1998, and addressed to both the partners and "JDRM Engineering, Inc.," which states that the scope of Speyer's legal representation includes advice related to "estate planning considerations associated with adoption of a tax-qualified pension plan * * *." Appellant concludes that the letter raises an issue of fact as to whether Speyer assumed a legal duty to make certain that Gary Driftmyer set up a separate trust for his life insurance proceeds. Speyer responds that summary judgment is proper in this case since, even if such a duty existed, Speyer's responsibilities ended when both he and Carlton advised Gary Driftmyer to set up a separate trust outside the Plan for his life insurance proceeds. Neither of these arguments is dispositive of the issues raised herein, for the following reasons.
 {¶ 65} In our analysis of the issue raised in appellant's second assignment of error, we determined that "the record contains no evidence of foreseeable harm to Gary Driftmyer's estate, based on either the naming of the "JDRM Engineering, Inc. Fully-Insured Defined Pension Benefit Trust" as the beneficiary of Driftmyer's life insurance policy, or Driftmyer's failure to establish a separate trust to receive his life insurance proceeds from the Special Trustee pursuant to Article IV, Section 4.10(a)." As set forth above, "`[w]here there is no obligation of care or caution, there can be no actionable negligence.'"Miller, supra, at ¶ 26, quoting 70 Ohio Jurisprudence 3d (1986), 53-54, Negligence, Section 13. Because appellant has not demonstrated the existence of a genuine issue of fact as to whether Speyer breached anexisting duty to Gary Driftmyer's *Page 29 
estate in this case, she is unable to maintain an action in legal malpractice.[5] Vahila v. Hall, supra. Appellant's second argument is without merit.
 {¶ 66} We further find that, because Speyer breached no existing legal duty to Gary Driftmyer, Marshall Mellhorn cannot be held vicariously liable for Speyer's acts. Appellant's third argument is, therefore, meritless.
 {¶ 67} On consideration of the foregoing, which includes our determination as to appellant's second assignment of error as set forth above, we find no genuine issue remains as to whether either Speyer or Marshall Melhorn owed a fiduciary duty to ensure the creation of a separate trust by Gary Driftmyer. Appellant's third assignment of error is not well-taken.
 {¶ 68} In her fourth assignment of error, appellant asserts that the trial court erred by finding that Turner breached no fiduciary duty to Gary Driftmyer because a genuine issue of fact remains as to whether Turner failed to ensure that: 1) "a proper existing beneficiary was named" for Gary Driftmyer's life insurance policy; and 2) that a separate trust was created to receive the life insurance proceeds. Appellant further asserts that M. Paul Turner Co. was vicariously liable for Turner's individual negligence. In support, appellant relies on the undisputed fact that each of the partners executed a power of attorney allowing Turner to help establish the Plan and to file forms with the IRS on behalf of the Plan. Appellant further relies on Smith's affidavit and report, in which he *Page 30 
stated that Turner had a fiduciary relationship with Gary Driftmyer, which was breached when Turner failed to ensure that a trust was created and that a "proper beneficiary" was named to receive the life insurance proceeds.
 {¶ 69} A review of the record shows that, in his deposition, Smith testified he is not an actuary and he was not sure of Turner's duties in relationship to the partners. Neither Johnson nor Bergh expressed criticism of Turner in his role as actuary for the Plan, and Mockensturm had no opinion as to the negligence of any of the appellees in this case, let alone Turner.
 {¶ 70} On consideration of the foregoing, in addition to our determination as appellant's second and sixth assignments of error, we find appellant has presented no evidence whatsoever to establish that either M. Paul Turner or M. Paul Turner Co. breached any existing fiduciary duty to JDRM or Gary Driftmyer. Appellant's fourth assignment of error is not well-taken.
 {¶ 71} In her fifth assignment of error, appellant asserts that the trial court erred by finding that Velandra[6] breached no duty, fiduciary or otherwise, to Gary Driftmyer. In support, appellant argues that she presented expert testimony to show that Velandra, as Special Trustee of the Plan, had a fiduciary duty to ensure that a "Qualified Pension Trust" was created to receive the proceeds of Gary Driftmyer's life insurance policy and *Page 31 
was listed as the beneficiary of that policy. Appellant further argues that the record contains no evidence that the "JDRM Engineering, Inc. Fully-Insured Defined Pension Benefit Trust" ever existed or that Velandra was named as its trustee. Finally, appellant reasserts that Velandra had a fiduciary duty to advise Gary Driftmyer to set up a trust because Driftmyer lacked the legal expertise to know what to do, he signed a confidentiality agreement prohibiting him from seeking outside counsel, and he intended for the proceeds of the policy to go appellant. These arguments are not persuasive, for the following reasons.
 {¶ 72} In our determination of appellant's sixth assignment of error, we found that: 1) "the name `JDRM Engineering, Inc., Fully Insured Defined Benefit Pension Trust' refers to the trust that was set up as part of the Plan;" and 2) the only reasonable interpretation of Velandra's role is that she was designated as the "`Special Trustee' for Gary Driftmyer under the trust portion of the Plan, with the specific duty of receiving life insurance and annuity proceeds and distributing them to one or more of a defined class of beneficiaries in the event of his death."
 {¶ 73} In our determination as to appellant's second assignment of error, we found that Gary Driftmyer's estate suffered no foreseeable harm.[7] Accordingly, Velandra had no duty to advise Gary Driftmyer to set up a separate trust or to ensure that such a trust *Page 32 
was actually established. Any expert opinion as to a breach of such duty is, therefore, irrelevant. In addition, the Supreme Court of Ohio has held that the preparation of a trust or the giving of advice "[to] others on the legal consequences of their actions" constitutes the unauthorized practice of law, as prohibited by R.C. 4705.01.[8]Miami Co. Bar Assn. v. Wyandt Silvers, Inc., 107 Ohio St.3d 259,2005-Ohio-6430, ¶ 7. Accordingly Velandra, an accountant, was prohibited from advising Gary Driftmyer as to the consequences of establishing, or not establishing, a separate trust.
 {¶ 74} On consideration of the foregoing, we find that Velandra owed no duty to advise Gary Driftmyer to set up a separate trust, or to ensure that such a trust was established.[9] Appellant's fifth assignment of error is not well-taken.
 {¶ 75} On consideration whereof, this court finds further that there remains no other genuine issue of material fact. Accordingly, after considering the evidence presented in a light most favorable to appellant, appellees are entitled to summary judgment as a matter of law. *Page 33 
 {¶ 76} The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 {¶ 77} This matter is also before the court on a motion for appellate attorney fees and costs filed by appellees, M. Paul Turner and M. Paul Turner Co. In support, appellees assert that appellant presented no expert testimony to show that M. Paul Turner was negligent in this case. Accordingly, M. Paul Turner and M. Paul Turner Co. argue that, as to them, this appeal "is frivolous and presents no reasonable question for review."
 {¶ 78} App.R. 23 states:
 {¶ 79} "If a court of appeals shall determine that an appeal is frivolous, it may require the appellant to pay reasonable expenses of the appellee including attorney fees and costs."
 {¶ 80} On consideration we find that, while appellant did not present sufficient evidence to prevail against these appellees on appeal, she did present an arguable issue for our review. Accordingly, her appeal is not entirely frivolous. Appellees' motion for appellate attorney fees and costs is denied.
 JUDGMENT AFFIRMED. *Page 34 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Thomas J. Osowik, J., CONCUR.
[1] Throughout these trial court's proceedings, several references were made to a "confidentiality agreement." However, it was never made a part of the record in this case.
[2] The Plan document placed certain other restrictions on the Special Trustee's powers which favor distribution to a surviving spouse; however, since Gary Driftmyer was not married at the time of his death, any discussion of those provisions is irrelevant to our determination of the issues raised in this appeal.
[3] It is also undisputed that Driftmyer's total estate contained approximately $3 million in assets and that appellant, as sole beneficiary, received approximately $1.8 million after all taxes and other expenses were paid.
[4] In this case the duty, if any, was owed to Gary Driftmyer. Accordingly, appellant is limited to bringing an action for legal malpractice only in her capacity as administrator of Driftmyer's estate.Simon v. Zipperstein (1987), 32 Ohio St.3d 74.
[5] Similarly, we note that, as the unnamed beneficiary of a non-existent trust, appellant would be unable to maintain an action against Speyer on her own behalf. Lewis v. Star Bank (1993),90 Ohio App.3d 709, 712, citing Papiernik v. Papiernik (1989),45 Ohio St.3d 337.
[6] Appellant's fifth assignment of error also refers to Velandra, Zbierajewski Nowicki, L.L.C., IR of Florida, and IR of Ohio as appellees; however, her argument in support thereof refers only to Linda Velandra in her role as Special Trustee. Accordingly, for the sake of clarity, we will only refer to Velandra in our determination of this assignment of error.
[7] In making this determination, we noted that a copy of the confidentiality agreement is conspicuously absent from the record; therefore, any claims based on that document are without merit. In addition, it is undisputed that more than $1 million of Gary Driftmyer's life insurance proceeds did, ultimately, go to appellant. The record contains no evidence that less taxes would have been paid if appellant had been named as the primary beneficiary of her brother's life insurance policy.
[8] R.C. 4705.01 provides, in relevant part, that:
"No person shall be permitted to practice as an attorney and counselor at law, or to commence, conduct, or defend any action or proceeding in which the person is not a party concerned * * * unless the person has been admitted to the bar by order of the supreme court in compliance with its prescribed and published rules. * * *"
[9] On appeal, Velandra asserted that appellant's claims against her are barred by the statute of limitations, R.C. 2305.09(D), which limits claims for accountant negligence to four years. However, based on our determination that Velandra owed no duty to appellant as set forth above, this issue is moot. *Page 1