**In re Daniel J. MILES, Debtor.**

**James C. Cifelli, Chapter 7 Trustee, Plaintiff,**

v.

**Daniel J. MILES, Defendant.**

**Bankruptcy No. 09–92601–MHM. Adversary No. 10–6635.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Sept. 21, 2012.

James C. Cifelli, William D. Matthews, Lamberth, Cifelli, Stokes, Ellis & Nason, Atlanta, GA, for Plaintiff.

Joseph J. Burton, Jr., Mozley, Finlayson & Loggins, LLP, Atlanta, GA, for Defendant.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

MARGARET H. MURPHY,
Bankruptcy Judge.

This proceeding is before the court on Debtor's *Motion for Summary Judgment.* Plaintiff, the Chapter 7 Trustee ("Trustee"), filed a complaint objecting to Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4), and (5). Debtor argues that no genuine dispute exists as to any material facts that would satisfy the requirements of § 727(a)(2), (3), (4), or (5) and that, therefore, Debtor is entitled to judgment dismissing the *Objection to Discharge* and granting him a bankruptcy discharge as a matter of law. For the reasons set forth below, the Motion is *denied* in part and *granted* in part.

## I. STATEMENT OF FACTS

These proceedings stem from an involuntary Chapter 7 petition filed against Debtor December 9, 2009. Debtor moved to convert the case to Chapter 11, which relief was granted December 17, 2009; on Trustee's motion, the case was re-converted to Chapter 7 June 1, 2010.

Trustee's objection to discharge essentially centers on six transactions:

(1) the disposition of an 11.27 carat weight white diamond in a platinum setting (the "Ring");

(2) the disposition of three watches: a Vacheron Skeleton Tourbillon; a Patek Philippe Celestial; and a Vacheron Magellan (collectively, the "Watches");

(3) the disposition of a diamond necklace resembling a military dog tag (the "Dog Tag");

(4) the execution and prepayment of a residential lease for property at 8395 Jett Ferry Road executed in October 2009 (the "Residential Lease") and an amendment extending the Residential Lease also executed in October 2009 (the "Amendment");

(5) the execution and prepayment of a motor vehicle lease agreement for a 2009 BMW 750Li (the "BMW Lease"); and

(6) the investment of $400,000 in Blue Star Residential LLC, a multi family real estate business ("Blue Star"), in March 2009.

## A. The Ring

It is undisputed that Debtor purchased an 11.27 carat weight white diamond ring in 2004 or 2005 for approximately $650,000, that Debtor occasionally wore the Ring on his pinkie finger, and that the Ring was sold to East Coast Jewelry in October 2009. However, the agreement on the facts surrounding the Ring ends there.[1]

Debtor alleges that he gave the Ring to Nerissa Mursalim October 26, 2007 as part of a wedding engagement, and, although they discussed getting married within two years, they chose to keep the engagement quiet, with Ms. Mursalim abstaining from wearing the Ring in public and both parties refraining from telling anyone about the engagement. Debtor alleges that Ms. Mursalim broke off the engagement in May 2008, having discovered Debtor with

---

1. At least twice, Debtor asserts that Trustee "has admitted, in whole or in part, over ninety percent of the undisputed statements of material facts" that Debtor has submitted. Of course, a percentage figure is conclusory and irrelevant; more alarmingly, however, Debtor appears to be referring to a large number of times that Debtor's statements of fact cite to a deposition, and Trustee admits that testimony was given stating the fact alleged, but otherwise denies the fact itself. Debtor's argument, then, lies somewhere between disingenuous and obfuscatory.

another woman, and retained possession of the Ring. Debtor asserts that, after giving the Ring to Ms. Mursalim as part of their engagement, he never wore the Ring and possessed it only for a short time when he had the Ring repaired for Ms. Mursalim. Thus, Debtor explains, Ms. Mursalim sold the Ring to East Coast Jewelry on her own behalf as owner of the Ring.

Trustee alleges that the engagement was a "sham" designed to deprive the bankruptcy estate of the Ring, and that Debtor in fact retained ownership of the Ring. To support this assertion, Trustee points to the deposition of several individuals who claim that, because of their close relationship with Debtor during the time of the alleged engagement, Debtor could not have been engaged without their knowledge. Trustee also shows Debtor was seen wearing the Ring after the alleged engagement, and that Debtor's insurance schedules continued to list the Ring well after the alleged engagement and subsequent end of the alleged engagement.

## B. The Watches

Debtor claims that he sold the Watches to a Mr. Levi in two separate transactions—he sold the Vacheron Skeleton Tourbillon and the Patek Philippe Celestial for a combined $100,000 June 9, 2007, and the Vacheron Magellan for $22,000 February 10, 2008. Debtor claims that the sales were arms-length transactions for fair value based upon negotiations between the parties, and that he has provided Trustee records of the particular sales, as well as the dispositions of all his other watches. Trustee contends that the bills of sale for the Watches were handwritten after the fact, and are not credible records of the transaction. That Debtor has engaged in approximately seventy-five to a hundred watch sales, purchases, or trades in the past ten years, and that Debtor provided Trustee with Mr. Levi's contact information, is undisputed.

## C. The Dog Tag

Debtor states that, because he was hesitant about leaving the Dog Tag in his car or locker, he frequently exercised while wearing it. When he was working out at the L.A. Fitness Center on Holcomb Bridge Road one day in October 2009, the chain apparently broke, and the necklace was lost. Trustee disputes whether the Dog Tag was in fact lost.

Debtor did not file a claim for the lost Dog Tag with his insurance company. The Dog Tag was not separately scheduled on Debtor's insurance, and Debtor did not understand that a claim would exceed the deductible. Debtor did not accurately modify or update his insurance schedules to reflect the jewelry he currently held.

## D. The Residential Lease

In August, 2008, Debtor sold his condominium for $3,450,000, deposited those funds in his bank account, and funded capital calls for his business from the proceeds of the sale. After the sale, Debtor entered into a lease of a condominium at Park Regency for a term from November 2008 through November 2009, which he prepaid. Near the end of his Park Regency lease, October 14, 2009, Debtor executed the Residential Lease and Amendment in question. The term of the Residential Lease was thirty months and the rent $120,000; the Amendment, executed the same day, extended that term an additional five months for $20,000. Debtor prepaid the $140,000 due under the Residential Lease and Amendment in payments of $60,000, $20,000, and $60,000 to the landlord, Rame Properties LLC. At the time of execution of the Residential Lease and Amendment, Debtor was unemployed.

Debtor claims that, because he was unemployed, prepayment was a condition of the lease. Debtor further notes that it had been his practice for several years to prepay leases, as evidenced by this Park Regency lease and a lease on a storage unit. Trustee notes that Debtor has provided few examples of his history of pre-paying leases, other than the leases challenged in this action.

### E. The BMW Lease

Debtor executed the BMW lease in October 2009 for a term of thirty-six months, and prepaid the lease in full. Trustee asserts that prepayment of the lease was part of a scheme to convert pre-petition assets into post-petition personal benefit. Debtor claims that he executed the lease because he was trying to sell the car he owned, that it was his practice to prepay for leases, and that he did not believe he could get the lease without prepayment because he was unemployed at the time. It is undisputed that, in the fall of 2009, Debtor attempted to sell his Mercedes automobile.

### F. Blue Star

In March 2009, Debtor founded Blue Star, a business designed to acquire, renovate, and manage B and C grade multifamily properties; Debtor capitalized Blue Star in August 2009. The owners of Blue Star were Debtor, Mr. Thomas Quincy Jones, and Mr. Andrew Eilers. Debtor capitalized Blue Star with an investment of $400,000, Mr. Eilers invested $50,000; and, while Mr. Jones apparently did not invest funds into the business, he did take a significant salary deduction to join Blue Star. Trustee alleges that the capitalization of Blue Star was not an arms-length transaction, as evidenced by Debtor's disproportionately low, 20% ownership share of the business. Trustee further alleges that, whereas the funds of Blue Star have been exhausted and the company has ceased operations, Debtor funded Blue Star in an effort to convert $400,000 of pre-petition assets into post-petition salary. Debtor received a total of approximately $40,000 in salary from Blue Star.

## II. CONCLUSIONS OF LAW

Pursuant to FRCP 56(c), incorporated in Bankruptcy Rule 7056, a party moving for summary judgment is entitled to prevail if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. The burden of proof is on the moving party to establish that a genuine issue of material fact is absent. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). Evidence is to be construed in the light most favorable to the nonmoving party. *Id.; Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987). However, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FRCP 56(e); *Accord, Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590 (11th Cir.1995) (nonmoving party must go beyond the pleadings and present evidence and designate specific facts to show a genuine issue for trial.). When the nonmoving party bears the burden of proof at trial, the moving party in a summary judgment motion must show that the nonmoving party has no evidence to support its case or present affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Hammer v. Slater*, 20 F.3d 1137 (11th Cir.1994).

Where contradictory inferences may be drawn from undisputed evidentiary facts, summary judgment is usually inappropriate. *Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir.1978) [2]; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Braxton–Secret v. A. H. Robins Co.*, 769 F.2d 528 (9th Cir. 1985); *Mercantile Bank & Trust Co., Ltd. v. Fidelity & Deposit Co.*, 750 F.2d 838 (11th Cir.1985).

## III. DISCUSSION

### A. Count 1

Trustee alleges Debtor has failed to keep or preserve records from which his business transactions might be ascertained, and has failed to explain satisfactorily a loss of assets or deficiency of assets to meet the debtor's liabilities. Thus, Trustee alleges Debtor is not entitled to discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(5).

**(1) 727(a)(3)**

■ Because objections to discharge under § 727(a)(3) normally require a fact intensive examination of the adequacy of Debtor's records, they are not usually decided on summary judgment. *In re Liu*, 288 B.R. 155, 162 (Bankr.N.D.Ga.2002) (J. Bihary). "Sustaining an objection to discharge under § 727(a)(3) requires evidence establishing:

'(1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor.' "

■ *Id.*, quoting *Barman v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr.E.D.Mich.2000). "The transactions need not be stated in full detail if they are so identified that inquiry can be made about them." *International Shoe Co. V. [v.] Lewine*, 68 F.2d 517, 518 (5th Cir.1934).

■ Trustee asserts that, because Debtor provided Trustee with handwritten documents written after-the-fact, the documents provided as records of selling the Watches to Mr. Levi are not credible, and thus Debtor has failed to keep or preserve records from which his business transactions might be ascertained.

However, just as Trustee cannot rest on mere denials of Debtor's pleadings, Trustee cannot baldly assert that the documents Debtor provided are not sufficient. Trustee has cited no authority stating that handwritten documents are not adequate records of business transactions, nor has Trustee provided any circumstantial evidence by which we might question the documents' credibility. Trustee has been given information about the transaction, as well as Mr. Levi's contact information, so that inquiry could be made about the transaction. With all that, Trustee has failed to show that a genuine issue exists for trial; therefore, summary judgment for Debtor is appropriate.

**(2) 727(a)(5)**

■ Trustee alleges Debtor has failed to explain satisfactorily a loss of assets or deficiency of assets to meet

---

**2.** *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), renders decisions of the Fifth Circuit issued prior to September 30, 1981, binding precedent for the Eleventh Circuit.

Debtor's liabilities, and is therefore not entitled discharge pursuant to 11 U.S.C. 727(a)(5). It is undisputed that the Ring, the Watches, and the Dog Tag have been sold, given away, or lost. Once Trustee has shown missing assets, the burden shifts to Debtor to explain the loss. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *In re Liu*, 288 B.R. at 162. Whether Debtor's explanation is sufficient to prevent a denial of discharge under § 727(a)(5) is a question of fact. *Id.*

■ Debtor has explained the disposition of the Ring, the Watches, and the Dog Tag. Trustee questions the credibility of Debtor's explanations, and, as discussed in Section C below, points to the depositions of several people that directly contradict Debtor's explanation of the disposition of the Ring. The court may not weigh conflicting evidence to resolve factual disputes; if a genuine issue of material fact is found, summary judgment must be denied. *Ryder International Corporation v. First American National Bank*, 943 F.2d 1521 (11th Cir. 1991).

## B. Count 2

Trustee alleges Debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under Title 11, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, within one year before the date of the filing of the petition, and therefore is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2).

■■ An objection to discharge under § 727(a)(2) requires establishing: (1) a transfer or concealment of property of the debtor within one year of the bankruptcy; and (2) a subjective intent to hinder, delay, or defraud a creditor. *In re Liu*, 288 B.R. at 158–159. Subjective intent is a question of credibility; where credibility is in issue, summary judgment is usually inappropriate. *See Davis v. U.S.*, 705 F.Supp. 446 (C.D.Ill. 1989).

### (1) The Ring

Debtor asserts that the transfer of the Ring to Ms. Mursalim occurred more than one year before the petition was filed, and so it must be beyond the scope of § 727(a)(2). Trustee, however, contends that ownership of the Ring was not transferred to Ms. Mursalim, and that Ms. Mursalim eventually sold the Ring on behalf of Debtor and invested the proceeds into entities associated with Debtor as part of a scheme to defraud Debtor's creditors. Thus, the transfer Trustee challenges is the one to East Coast Jewelry in October 2009, within one year of the petition to file bankruptcy.

■ In support of his assertion, Trustee points to the testimony of a number of Debtor's colleagues who believe that Debtor was not engaged to Ms. Mursalim, as well as the testimony of a number of individuals who saw Debtor wearing the Ring after the alleged transfer to Ms. Mursalim, and, indeed, after the end of the alleged engagement. Trustee further points to Debtor's insurance schedules in support of Debtor's continued ownership of the Ring. Specifically, in May 2007, Debtor obtained an insurance policy on two rings: one with a yellow diamond of approximately 13.57 carats, and another with a colorless diamond of approximately 11.27 carats. In April or May of 2008, Debtor sold the ring with the yellow

diamond, and in August of 2008, Debtor adjusted his insurance to cover only one ring, the one with a colorless 11.27 carat diamond. Trustee contends that this adjustment, to cover only the one Ring, belies Debtor's claim that he gave the Ring to Ms. Mursalim in October 2007 and lost all claim to it in May 2008, when the purported engagement ended. Finally, Trustee notes that, after selling the Ring for $525,000, Ms. Mursalim lent Debtor or invested in entities associated with Debtor a combined $435,000.[3] Trustee asserts that the evidence, taken together, suggests a scheme to fraudulently place the Ring out of the reach of creditors.

Because evidence must be construed in the light most favorable to the nonmoving party, summary judgment with respect to the Ring under § 727(a)(2) must be denied.

### (2) The Watches

Trustee has not alleged that the disposition of the Watches occurred within one year of the petition; thus, the Watches are outside the scope of § 727(a)(2) and summary judgment is appropriate.

### (3) The Dog Tag

▮▮▮ Debtor asserts that the Dog Tag was not transferred or concealed—it was lost. Trustee contends generally that Debtor's testimony about the Dog Tag is not credible. The only circumstance presented that might suggest that Debtor's explanation about the Dog Tag was not truthful is Debtor's failure to claim insurance on the item, but Trustee apparently admits that Debtor "did not understand that a claim would exceed the deductible,"—*i.e.*, that Debtor could have recovered under the insurance. *Plaintiff's Response To Defendant's Statement of Material Facts to Which No Genuine Issue Exists*, ¶ 88. Trustee's mere denial of Debtor's pleading is not enough, and summary judgment is appropriate.

### (4) Prepayment of the BMW Lease and the Residential Lease

▮▮▮ Debtor asserts that prepayment of leases was his usual practice, that it was not his intent to defraud creditors, and that it was not his intent to file for bankruptcy. Debtor further notes that his then-current residential lease was about to expire when he entered into the Residential Lease, and he was trying to sell his car when he entered into the automobile lease.

▮▮▮ Trustee questions Debtor's assertion that prepayment of leases was his usual practice; Debtor has noted only two instances of prepaying for leases, once for the one-year lease of the condo Debtor lived in during 2009, and again for a storage unit. The prepayment of a storage unit lease and a one-year condo lease is insufficient to establish that prepayment of a 36 month luxury automobile lease and a 35 month luxury house

---

**3.** Trustee alleges Mursalim lent approximately $35,000 to Debtor via a $20,000 check to Burton & Armstrong, a $10,000 check to Debtor, and a $5,000 check to Gardner, Groff, Greenwald & Villanueva. She invested $150,000 in "Marquise at Southern Woods," the owner of apartment complexes known as Southern Woods, which apartments are managed by Star Residential. Debtor owns a membership interest in and works for Star Residential. She invested $250,000 in MCA Investment, LLC, and received $52k from MCA Investment Group, LLC; while denying knowledge of those two transactions, Debtor admits that the phone number listed on the MCA Investment Group check would reach his office address for Star Residential.

lease are part of Debtor's "usual practice." Trustee argues that the circumstances surrounding the transactions, Debtor having met with a bankruptcy attorney in June 2009 and then having entered into a three-year lease term for a luxury automobile and a nearly three-year lease term for a luxury home just two months before the involuntary bankruptcy petition was filed, suggest that Debtor may have anticipated bankruptcy, whether voluntary or involuntary, and attempted to pay for a luxury residence and luxury automobile before that bankruptcy occurred. Through this mechanism, Trustee argues, Debtor placed nearly $200,000 beyond the reach of his creditors. Where contradictory inferences may be drawn from undisputed evidentiary facts, summary judgment is inappropriate. *Nunez*, 572 F.2d 1119.

**(5) Capital Contribution to Blue Star**

■ Debtor asserts that the capital contribution to Blue Star was an arms length transaction for value—his membership interest—and the membership interest in Blue Star is an asset of the estate. Debtor contends that, contrary to trying to defraud creditors, he entered into Blue Star hoping to generate personal income with which he could repay creditors.

Trustee argues that the ownership structure of Blue Star, and specifically the disproportionately low ownership interest Debtor received for his contribution, belies the assertion that the capitalization was an arms-length transaction. Specifically, Debtor contributed $400,000, Mr. Eilers contributed $50,000, and Mr. Jones contributed nothing but took a salary cut to join Blue Star; for his contribution, Debtor received a 20% membership interest. As of February 8, 2010, four months after capitalization, Blue Star's only incoming revenue was the management fee generated by the management of a single apartment complex—the salaries of Debtor, Mr. Jones, and a Mr. John Huckabee were paid out of capital. Trustee notes that the membership interest is now worthless; Blue Star has concluded business and has no remaining capital. Thus, Trustee contends, by capitalizing Blue Star in the amount of $400,000, Debtor pre-funded $40,000 or $50,000 in salary to himself that would have otherwise been turned over to creditors.

Whether Debtor did in fact receive fair value for his capital contribution, and whether the capital contribution was a mechanism for Debtor to defraud his creditors or merely a bad investment, are genuine issues of material fact. Thus, summary judgment is not appropriate.

## C. Count 3

In Count 3, Trustee alleges Debtor has knowingly and fraudulently made one or more false oaths in connection with this case and, therefore, is not entitled to discharge pursuant to 11 U.S.C. § 727(a)(4).

Thus, in support of Debtor's motion for summary judgment with respect to Count 3, Debtor must show that no genuine issue of material fact exists as to the truth of any oath made by Debtor in connection with this case, or that no issue of material fact exists as to whether Debtor knowingly and fraudulently made such statements.

**(1) The Ring**

■ Genuine issues of material fact exist regarding oaths Debtor has

made in connection with the Ring. Debtor has stated under oath that he gave the Ring to Nerissa Mursalim October 26, 2007, as part of a wedding engagement, and that Debtor has not worn the Ring since that date. Trustee has offered evidence that neither claim is true.

Trustee first claims that the engagement was a sham. In support of his assertion, Trustee points to the depositions of Kendall Doble and Christian Shields, individuals who state that, because of their close relationship with Debtor, he could not have been married without their knowledge and that they did not believe Debtor was, in fact, engaged. Both Mr. Doble and his wife, Lynn Doble, testified that, if Debtor were to marry, they believe it would have been to Ms. Allison Williams, not Nerissa Mursalim. Trustee further points to the suspicious circumstances of the alleged engagement, noting that Debtor and Ms. Mursalim apparently did not let anyone in on their secret for the length of their months-long engagement. In response, Debtor contends that Trustee has offered nothing but speculation that the engagement was a sham, and that the speculation of Mr. and Mrs. Doble and Mr. Shields regarding the engagement is tainted by those individuals' personal agendas. Where the credibility of witnesses is in issue, however, summary judgment is inappropriate. *See Davis,* 705 F.Supp. 446.

Next, Trustee challenges Debtor's assertion that he had not worn the Ring since the alleged engagement, pointing to the testimony of several individuals who claim to have seen Debtor wearing the ring August 6, 2008. Debtor argues that the witnesses who claim to have seen Debtor wearing the ring in 2008 may have seen one of Debtor's other large-carat diamond rings, and notes particularly one man's testimony that the ring in question was not on Debtor's pinkie. It follows, Debtor argues, that since the Ring was fitted for Debtor's pinkie, the ring Debtor was seen wearing could not have been the 11.27 carat white diamond Ring. It is undisputed that Debtor at one time owned another large diamond ring—an approximately 12 or 13 carat yellow diamond ring Debtor purchased in 2005 or 2006—but that ring, too, was fitted for Debtor's pinkie, and was sold in April or May of 2008. In their depositions, Joseph Harrell and Kristine Pietrewicz each specifically identified the ring they saw on August 6, 2008 as a pinkie ring. Ms. Pietrewicz noted that the ring contained a white diamond, and Mr. Harrell noted that it was not a yellow diamond. Joseph Mirabella, the one witness who claimed that the ring in question was not on Debtor's pinkie, also noted that it was a white or clear diamond, and later said that he was not certain which finger the ring was on. Lynn Doble testified to having seen Debtor wear the Ring in December 2008, as well as in September or October 2008. Kendall Doble, too, testified to having seen Debtor wear the ring, which he distinguished from the other, yellow ring, in 2008.

(2) **The Watches**

█ No genuine issues of material fact exist with respect to Debtor's oaths about the Watches. Debtor contends that nothing suggests false oath in regards to the Watches. Trustee contends that the documents Debtor gave evidencing the transaction are not credible, and that Debtor's credibility with respect to the

Watches should be assessed in court. However, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FRCP 56(e). Trustee has provided nothing but the assertion that Debtor's credibility must be assessed at trial.

### (3) The Dog Tag

█ Trustee has produced no evidence suggesting that Debtor's explanation of the missing Dog Tag is false. Trustee vaguely claims that circumstantial evidence calls the credibility of Debtor's account into question, but to survive a motion to dismiss, Trustee "must set forth specific facts showing that there is a genuine issue for trial." FRCP 56(e). The only circumstance presented that might suggest Debtor's explanation about the Dog Tag was not truthful is Debt-or's failure to claim insurance on the item, but, as already discussed, Trustee apparently admits that Debtor "did not understand that a claim would exceed the deductible."

## IV. CONCLUSION

In accordance with the above reasoning, Debtor's motion is **granted** on the § 727(a)(2) claim as it relates to the Watches and the Dog Tag, **granted** on the § 727(a)(3) claim, and **granted** on the § 727(a)(4) claim as it relates to the Watches and the Dog Tag. As respects the remaining § 727(a)(2) and (a)(4) claims and on the § 727(a)(5) claim, Debtor's motion is denied.

IT IS SO ORDERED.